(No. 73999.—

*In re* ILLINOIS BELL SWITCHING STATION LITIGATION.

*Opinion filed July 28, 1994.—Rehearing denied October 3, 1994.*

234

MILLER, J., specially concurring.
HARRISON, J., joined by BILANDIC, C.J., dissenting.

Appeal from the Appellate Court for the First District; heard in that court on appeal from the Circuit Court of Cook County, the Hon. Roger J. Kiley, Jr., and Hon. Monica D. Reynolds, Judges, presiding.

Edward T. Joyce & Associates (Arthur W. Aufman and Paul A. Castiglione, of counsel), William J. Harte, Ltd., and Karla Wright, Ltd., all of Chicago, and Vincent L. DiTommaso, of DiTommaso & Berman, P.C., of Oak Brook Terrace, for appellants certain customers of Illinois Bell Telephone Co.

Susan P. Jordan, of Lord, Bissell & Brook, and Edward A. Butts and John C. Gockley, Jr., all of Chicago, Kenneth W. Starr and Christopher Landau, of Washington, D.C., and Frank Cicero, Jr., Emily Nicklin, J. Andrew Langan, Walter R. Lancaster and Michelle

H. Browdy, of Chicago, all of Kirkland & Ellis, for appellee Illinois Bell Telephone Co.

Gerald A. Ambrose and George A. Platz III, of Sidley & Austin, and Thomas R. Phillips and Larry Salustro, all of Chicago, for *amicus curiae* AT&T Communications of Illinois, Inc.

Dennis K. Muncy and Peggy C. Thompson, of Meyer, Capel, Hirschfeld, Muncy, Jahn & Aldeen, P.C., of Champaign, for *amicus curiae* Illinois Independent Telephone Association.

JUSTICE HEIPLE delivered the opinion of the court:

This case arose after a telephone switching station caught fire, allegedly due to the negligent or willful failure of Illinois Bell Telephone Company to take adequate fire-prevention measures. The fire left the affected class (plaintiffs) without telephone services for about a month. Plaintiffs now seek to recover the economic damages they incurred from that loss of service.

At issue is whether this statutory action for civil damages brought against Illinois Bell Telephone Company (Bell) is barred by either Illinois' "economic loss doctrine" or an exculpatory clause in Bell's tariff filed with the Illinois Commerce Commission.

Plaintiffs filed a complaint in the circuit court of Cook County, framed as a class action representing customers of Bell, against Bell alleging economic damages as a result of a fire in Bell's Hinsdale, Illinois, switching station which disrupted service for one month. Counts I and II of plaintiffs' complaint alleged violations of the Illinois Public Utilities Act (Act) (220 ILCS 5/1—101 *et seq.* (West 1992)), and count V sought a declaratory judgment that a provision in Bell's tariff did not

bar their claims. Counts III and IV are not before this court.

The circuit court dismissed counts I through IV and granted summary judgment for Bell on count V. Plaintiffs appealed the court's order pertaining to counts I, II and V, but the appellate court affirmed with one justice dissenting. (234 Ill. App. 3d 457.) We affirm.

Bell has five telephone switching stations which route and direct telephone calls over particular geographic areas. The subject of this litigation is Bell's switching station in Hinsdale, Illinois. The Hinsdale station services the western and southwestern suburbs of Chicago and is able to process 3.5 million calls per day.

In order to protect the computer equipment and cables housed in its Hinsdale station from fire, Bell equipped it with an automatic fire sensor which would detect the presence of fire. In addition, Bell equipped the Hinsdale station with a fire alarm which would sound if a fire was detected; the alarm was connected so that, if sounded, it would register in Bell's office in Springfield. However, Bell did not connect the alarm to a local fire or police department. Further, although the Hinsdale station was automated and usually devoid of people, Bell did not install automatic fire-fighting equipment. Rather, it merely bolted manual extinguishers on the walls of the station.

On the afternoon of May 8, 1988, a fire started in Bell's Hinsdale switching station. No one was in the station at this time; however, the fire alarm was triggered and, at 3:50 p.m., registered for nine consecutive minutes in Bell's Springfield office. After the alarm sounded, Bell did not respond. The fire triggered a second alarm in Bell's Springfield office at 4:20 p.m., but Bell again did not respond.

At 4:50 p.m., someone passing the Hinsdale station

saw smoke coming from the building and alerted the fire department. Although the fire department arrived within minutes, the Hinsdale station was already consumed by fire and the contents of the station destroyed. Consequently, telephone service to the western and southwestern suburbs of Chicago was disrupted.

Because of the fire damage, telephone service to the area affected was disrupted for approximately one month. Thereafter, numerous Bell customers filed class action lawsuits against Bell as a result of the disruption in service. The cases were eventually consolidated. The complaint in its present form was filed as plaintiffs' second-amended complaint.

In count I of their second-amended complaint, plaintiffs charged Bell with violating sections 8—101 and 8—401 of the Act, as well as Illinois Commerce Commission Rules (Commission Rules) 402(a) and 408(a). Count II charged Bell with the willful violations of these same sections.

Section 8—101 requires Bell to

"furnish, provide and maintain such service instrumentalities, equipment and facilities as shall promote the safety, health, comfort and convenience of its patrons, employees and public and as shall be in all respects adequate, efficient, just and reasonable." (220 ILCS 5/8—101 (West 1992).)

Section 8—401 similarly requires Bell to provide service and facilities "which are in all respects adequate, efficient, reliable and environmentally safe." (220 ILCS 5/8—401 (West 1992).) Commission Rule 402(a) requires Bell to adopt and pursue maintenance programs aimed at preventing service interruptions. Commission Rule 408(a) requires Bell to make reasonable provisions to meet emergencies caused by fire. 83 Ill. Adm. Code §§ 730.402(a), 730.408(a) (1985).

The source of plaintiffs' remedy is section 5—201 of

the Act (220 ILCS 5/5—201 (West 1992)). That section, which is applicable to Illinois Bell by virtue of section 13—101 of the Universal Telephone Service Protection Law of 1985 (220 ILCS 5/13—101 (West 1992)), provides:

> "In case any public utility shall do, cause to be done or permit to be done any act, matter or thing prohibited, forbidden or declared to be unlawful, or shall omit to do any act, matter or thing required to be done either by any provisions of this Act or any rule, regulation, order or decision of the [Illinois Commerce] Commission, issued under authority of this Act, *the public utility shall be liable to the persons or corporations affected thereby for all loss, damages or injury caused thereby or resulting therefrom*, and if the court shall find that the act or omission was wilful, the court may in addition to the actual damages, award damages for the sake of example and by the way of punishment." (Emphasis added.) 220 ILCS 5/5—201 (West 1992).

The complaint as it presently reads alleges an action based in tort. In dispute is whether the General Assembly intended to allow plaintiffs to recover economic damages in tort when it allowed affected persons and customers to recover "all" losses, damages or injuries.

Plaintiffs argue that the word "all" means exactly that—any loss, damage or injury whatsoever that can be traced to a utility's negligent or wilful violation of the Act or Commission rules. However, this court has previously rejected that very argument. In *Barthel v. Illinois Central Gulf R.R. Co.* (1978), 74 Ill. 2d 213, the plaintiffs sued for personal injuries and wrongful death resulting from a collision between a car and one of the defendant's freight trains. The *Barthel* plaintiffs sued under section 5—201 (then section 73) of the Act, alleging violations by the defendant of various regulations relating to the safety of railroad crossings. The *Barthel* plaintiffs made the same argument made by plaintiffs here: that when the General Assembly stated that a utility violating the Act "shall be liable" for "all

loss, damages or injury," the utility's liability was conclusively demonstrated. In *Barthel*, the plaintiffs sought the abrogation of the common law defense of contributory negligence.

This court, in rejecting the plaintiffs' argument, noted that the Act is in derogation of the common law, and therefore the tort principles limiting the plaintiffs' claims under the Act would not be deemed abrogated unless "it plainly appears that the intent of the statute" is to do so. (*Barthel*, 74 Ill. 2d at 221.) Statutes in derogation of the common law are to be strictly construed in favor of persons sought to be subjected to their operation. The courts will read nothing into such statutes by intendment or implication. (*Barthel*, 74 Ill. 2d at 220.) The court then held that the common law defense of contributory negligence was available, despite the Act's provision of liability for "all *** damages" resulting from a violation of the Act.

Having established that the General Assembly did not provide for limitless recovery, we must next determine if it meant to allow for recovery of economic damages in tort.

At common law, purely economic damages are generally not recoverable in tort actions. (*Moorman Manufacturing Co. v. National Tank Co.* (1982), 91 Ill. 2d 69.) In *Moorman*, the plaintiff had purchased a grain storage tank from defendant, which developed a crack. The plaintiff sued, seeking damages for the cost of replacing the tank and for loss of its use. The plaintiff's complaint was based upon the tort theories of strict liability, negligence and misrepresentation, as well as contract theories.

This court in *Moorman* enunciated the proposition that purely economic losses are generally not recoverable in tort actions. Three exceptions were articulated: (1) where the plaintiff has sustained damage resulting

from a sudden or dangerous occurrence (*Moorman*, 91 Ill. 2d at 86); (2) where the plaintiff's damages are the proximate result of a defendant's intentional, false representation (fraud) (*Moorman*, 91 Ill. 2d at 88-89); and (3) where the plaintiff's damages are a proximate result of a negligent misrepresentation by a defendant in the business of supplying information for the guidance of others in their business transactions. (*Moorman*, 91 Ill. 2d at 89.) None of these exceptions is present in this case.

The *Moorman* decision defined economic losses as " 'damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits—without any claim of personal injury or damage to other property ***' [citation] as well as 'the diminution in the value of the product because it is inferior in quality and does not work for the general purposes for which it was manufactured and sold.' [Citation.]" (*Moorman*, 91 Ill. 2d at 82.) The *Moorman* holding is bottomed upon the theory that tort law affords a remedy for losses occasioned by personal injuries or damage to one's property, but contract law and the Uniform Commercial Code offer the appropriate remedy for economic losses occasioned by diminished commercial expectations not coupled with injury to person or property. The *Moorman* court concluded that qualitative defects are best handled by contract rather than tort law. Tort law is "appropriately suited for personal injury or property damage resulting from a sudden or dangerous occurrence" whereas the remedy for a "loss relating to a purchaser's disappointed expectations due to deterioration, internal breakdown or nonaccidental cause *** lies in contract." *Moorman*, 91 Ill. 2d at 86.

This action, if allowed, would be in derogation of the common law. Therefore, under *Barthel* the Act must be

strictly construed against plaintiffs. A strict construction of section 5—201 in Bell's favor leads us to conclude that plaintiffs' complaint cannot stand. Section 5—201's provision that allows recovery for "all loss, damages or injury" permits recovery of all losses and damages authorized under the common law. Since the allegations of plaintiffs' complaint call forth no exception to the *Moorman* doctrine, a tort action is precluded.

The second issue presented for our review is whether the trial court correctly entered summary judgment in favor of Bell on count V of plaintiffs' second-amended complaint. In that count, plaintiffs sought a declaratory judgment that an exculpatory clause in the tariff that Bell filed with the Illinois Commerce Commission does not preclude this action. This issue is not rendered moot by our disposition of the first issue. Were we to conclude that the tariff does not bar this action, we could remand this cause to allow plaintiffs to amend their complaint.

The most recent tariff, like other tariffs filed by Bell going back several decades, lists among its general "regulations" a service interruption liability exclusion. That exclusion provides:

"The liability of the Company for damages arising out of mistakes, omissions, interruptions, delays, errors or defects in transmission occurring in the course of furnishing service *** shall in no event exceed an amount equivalent to the proportionate charge to the customer for the period of service during which such mistake, omission, interruption, delay, error or defect in transmission occurs. No other liability shall in any case attach to the Company." Illinois Bell Telephone Company Tariff, Illinois Commerce Commission, No. 5, pt. 1, § 5, par. 3.1.

Plaintiffs contend that Bell's tariff, filed with the Commission in accordance with the Act, is actually in contravention of the Act and therefore does not protect Bell from liability for interruption in service. Moreover, although the tariff, which describes the "terms and conditions of service," preempts any contract expectancy

from customers and contains an exculpatory clause which bars recovery for consequential damages due to interruptions in service, plaintiffs maintain that it is against public policy and should not bar plaintiffs' claims.

In response, Bell contends that the tariff is not against public policy and, further, that the tariff, accepted by the legislature for 50 years, legally defines the limits of its liability for interruptions in service. Consequently, Bell maintains that the tariff bars plaintiffs' claims.

Plaintiffs predicate their claims upon Bell's duties pursuant to the same sections of the Act and the same Commission rules which it uses to support its tort claim: sections 8—101 and 8—401 of the Act (220 ILCS 5/8—101, 8—401 (West 1992)), and Commission Rules 402(a) and 408(a) (83 Ill. Adm. Code §§ 730.402(a), 730.408(a) (1985)). Plaintiffs assert that Bell, in failing to provide automatic fire-fighting equipment and in failing to respond to the alarms which sounded in its Springfield office, violated both the Act and the Commission's rules. Consequently, plaintiffs argue that Bell should not be able to escape liability by use of exculpatory language in contravention of both the Act and the Commission's rules.

Initially, it should be noted that Bell is nowhere charged with the duty to provide completely uninterrupted service. Rather, it is required to provide "service and facilities which are in all respects adequate, efficient, reliable and environmentally safe and which *** constitute the least-cost means of meeting the utility's service obligations." (220 ILCS 5/8—401 (West 1992).) Adequate, efficient and reliable service is not tantamount to infallible service. Temporary disruptions may occur without reducing Bell's service to a level less than adequate, efficient or reliable. Thus, the tariff's

provision which limits Bell's liability in the event such a disruption in service occurs is not contrary to the Act or the rules.

In fact, the tariff is required by the Act and plays an integral role in allowing Bell to meet the expectations of the General Assembly. In enacting the Act, the legislature intended that "[t]elecommunications services should be available to all people of the State of Illinois at just, reasonable and affordable rates and be provided as widely and economically as possible." (Joint Committee on Public Utility Regulations (April 1985), at 21.) Bell is required to file a tariff "which describes the nature of the service, applicable rates and other charges, [and] terms and conditions of service" (220 ILCS 5/13—501 (West 1992)), in order to meet the legislature's dictate that it provide cost-effective service. Bell has done so for over 50 years, and during that time has always included the limitation of liability challenged here. The legislature has approved this limitation for over half a century.

We hold that the exculpatory language in Bell's tariff properly limits claims from disruption of service to a rebate of the costs for the missed service. This language, accepted for decades by the General Assembly, is neither in contravention of the Act passed by that same body, the rules passed by the Commission (an agency of that body), nor against public policy. Plaintiffs' claims are therefore barred.

In passing, we note that the California Supreme Court was faced with virtually the same factual scenario 20 years ago, and ruled as we do today. In *Waters v. Pacific Telephone Co.* (1974), 12 Cal. 3d 1, 523 P.2d 1161, 114 Cal. Rptr. 753, the plaintiff sued defendant Pacific Telephone Company after it failed to furnish adequate telephone service. Under California's Public Utilities Code, the defendant had to "furnish and

maintain such adequate, efficient, just, and reasonable service, instrumentalities, equipment, and facilities as are necessary to promote the safety, health, comfort, and convenience of its patrons, employees, and the public," language very similar to section 8—101 of the Illinois Act. California's code provided that "any public utility which does, causes to be done, or permits any act, matter, or thing prohibited or declared unlawful, or which omits to do any act, matter or thing required to be done *** shall be liable to the persons or corporations affected thereby for all loss, damages, or injury caused thereby or resulting therefrom." This language is very similar to section 5—201 of the Illinois Act.

Finally, California's code established the Public Utilities Commission, which *inter alia* had the authority to approve or disapprove tariffs filed by utilities. In *Waters*, the defendant had filed a tariff which limited its liability in the event of a service interruption to a "credit allowance" in an amount limited to "the total fixed charges for exchange service" for the period of phone service interruption.

The California Public Utilities Commission approved of the tariff, including the exculpatory clause. Their supreme court found that the exculpatory clause was enforceable and barred the action. In so ruling, it quoted a California appellate court opinion, noting:

> " 'The theory underlying [decisions upholding the right of regulated utilities to limit their liabilities] is that a public utility, being strictly regulated in all operations with considerable curtailment of its rights and privileges, shall likewise be regulated and limited as to its liabilities. In consideration of its being peculiarly the subject of state control, "its liability is and should be defined and limited." [Citation.] There is nothing harsh or inequitable in upholding such a limitation of liability when it is thus considered that the rates as fixed by the commission are established with the rule of limitation in mind. Reasonable rates are in part dependent upon such a rule.' "

*Waters v. Pacific Telephone Co.* (1974), 12 Cal. 3d 1, 7, 523 P.2d 1161, 1164, 114 Cal. Rptr. 753, 756, quoting *Cole v. Pacific Telephone & Telegraph Co.* (1952), 112 Cal. App. 2d 416, 419, 246 P.2d 686, 689.

In interpreting a statute, the primary rule, to which all other rules are subordinate, is to ascertain and give effect to the true intent and meaning of the legislature. (*Kraft, Inc. v. Edgar* (1990), 138 Ill. 2d 178, 189.) A statute or ordinance must receive a sensible construction, even though such construction qualifies the universality of its language. (*City of East St. Louis v. Union Electric Co.* (1967), 37 Ill. 2d 537, 542.) In this regard, it is relevant to note the absurdity of plaintiffs' suggested reading of the phrase "all loss, damages or injury."

The Hinsdale switching station is able to process 3.5 million calls per day. During the month the phone services were discontinued, there were potentially more than 100 million phone calls that were inconvenienced or prevented due to the fire.

Plaintiffs argue that the telephone company is liable for all losses flowing from this service interruption. They interpret all losses to mean losses of every type and description and to whomsoever they occur. Such losses would include lost business and defeated expectations of every type and, presumably, would not be limited to subscribing customers but would include anyone and everyone who might have routed a phone call through this facility. Given the imagination and resourcefulness of today's litigants, it is easy to speculate that this figure might run into the tens or even hundreds of millions of dollars. In short, the plaintiffs could well end up owning the telephone company as the result of a service interruption. Another possible alternative would be that phone rates would have to be increased astronomically to recoup such liability payments. That old adage still holds. There is no such thing as a free lunch. We do not

believe that the current state of the law contemplates the result which the plaintiffs seek.

For the foregoing reasons, the judgment of the appellate court is affirmed.

*Affirmed.*

JUSTICE MILLER, specially concurring:

I concur in the judgment of the court. I agree with the majority that the limitation on liability contained in Illinois Bell Telephone Company's tariff bars the present action and restricts the plaintiffs' recovery for the service outage involved here to the amounts paid by the plaintiffs for telephone services during the affected period. I write separately, however, to explain more fully my reasons for reaching this conclusion. Because the tariff provides a complete and independent answer in this case, we need not consider, and I do not address, the distinct question whether the *Moorman* doctrine (*Moorman Manufacturing Co. v. National Tank Co.* (1982), 91 Ill. 2d 69) governs the cause of action found in section 5—201 of the Public Utilities Act (220 ILCS 5/5—201 (West 1992)).

The dispositive issue raised in the present appeal is whether the cause of action authorized by section 5—201 of the Act must trump the limitation on liability appearing in Bell's tariff. For the reasons stated below, I believe that an assessment of the tariff, of judicial and administrative precedent, and of the policies that come into play in the legislatively prescribed scheme for setting utility rates compels the conclusion that the liability limitation should be given effect. Accordingly, the present plaintiffs may not recover damages beyond those expressly allowed by the tariff.

Setting utility rates is a legislative function, and.in Illinois the Commerce Commission is the body to which the General Assembly has delegated this responsibility. (*People ex rel. Hartigan v. Illinois Commerce Comm'n*

(1987), 117 Ill. 2d 120, 142; *Illinois Bell Telephone Co. v. Illinois Commerce Comm'n* (1973), 55 Ill. 2d 461, 469-70, quoting *Produce Terminal Corp. v. Illinois Commerce Comm'n* (1953), 414 Ill. 582, 589; 220 ILCS 5/4—101 (West 1992).) Like other regulated utilities, telecommunications carriers are required by statute to file tariffs with the Illinois Commerce Commission. (220 ILCS 5/13—01 (West 1992).) For telecommunications carriers, the proposed tariff must describe "the nature of the service, applicable rates and other charges, [and] terms and conditions of service," among other things. (220 ILCS 5/13—501 (West 1992).) The provisions of a tariff may be challenged by interested parties or by the Commerce Commission on its own initiative; unless a provision is suspended by the Commission pending a hearing and decision on a challenge, the provision generally goes into effect 45 days after the tariff is filed with the Commission. 220 ILCS 5/9—201(b) (West 1992).

An effective tariff has the force of law (*Illinois Central Gulf R.R. Co. v. Sankey Brothers, Inc.* (1978), 67 Ill. App. 3d 435, 439, *aff'd* (1979), 78 Ill. 2d 56), and it provides the source for, and determines the nature and extent of, a public utility's service obligations to customers (*J. Meyer & Co. v. Illinois Bell Telephone Co.* (1980), 88 Ill. App. 3d 53, 55; *Sarelas v. Illinois Bell Telephone Co.* (1963), 42 Ill. App. 2d 372, 374-75; *Illinois Bell Telephone Co. v. Miner* (1956), 11 Ill. App. 2d 44, 58). A company may not deviate from the terms of its tariff and must charge its customers the rates specified in the tariff.

Since 1936, each of Bell's successive tariffs has contained a provision limiting the company's liability "for damages arising out of mistakes, omissions, interruptions, delays, errors or defects in transmission" to "an amount equivalent to the proportionate charge to the customer for the period of service during which such

mistake, omission, interruption, delay, error or defect in transmission occurs." The terms of this liability limitation have remained virtually unchanged over time. Both the appellate court and the Commerce Commission have upheld the liability limitation in Bell's tariff against claims by customers for damages allegedly sustained as a result of disruptions or other errors or malfunctions in telephone service. *J. Meyer & Co. v. Illinois Bell Telephone Co.* (1980), 88 Ill. App. 3d 53; *Sarelas v. Illinois Bell Telephone Co.* (1963), 42 Ill. App. 2d 372; *Menco Corp. v. Illinois Bell Telephone Co.* (Illinois Commerce Commission Oct. 17, 1984), No. 84—0277.

A number of rationales support the enforcement of liability limitations in public utility tariffs. (See Note, *Limitation of Liability for Interruption of Service for Regulated Telephone Companies: An Outmoded Protection?*, 1993 U. Ill. L. Rev. 629, 639-43.) In the main, these reflect the status of public utilities as regulated monopolies whose operations are subject to extensive restrictions, the requirements of uniform, nondiscriminatory rates, and the goal of universal service, achieved through the preservation of utility prices that virtually all customers can afford. See *Western Union Telegraph Co. v. Esteve Brothers & Co.* (1921), 256 U.S. 566, 572-73, 65 L. Ed. 1094, 1098, 41 S. Ct. 584, 587; *Western Union Telegraph Co. v. Priester* (1928), 276 U.S. 252, 259-60, 72 L. Ed. 555, 565, 48 S. Ct. 234, 236; *Waters v. Pacific Telephone Co.* (1974), 12 Cal. 3d 1, 7-10, 523 P.2d 1161, 1164-66, 114 Cal. Rptr. 753, 756-58; *Professional Answering Service, Inc. v. Chesapeake & Potomac Telephone Co.* (D.C. App. 1989), 565 A.2d 55, 64-65; *J. Meyer & Co. v. Illinois Bell Telephone Co.* (1980), 88 Ill. App. 3d 53, 57.

The concerns that justify the enforcement of liability limitations are present here. The provisions of Bell's tariff reflect a balancing of Bell's service obligations to its diverse customer base and of the interest of customers

in the continuation of affordable telephone services. The General Assembly has found that "universally available and widely affordable telecommunications services are essential to the health, welfare and prosperity of all Illinois citizens" (220 ILCS 5/13—102(a) (West 1992)) and, further, that "protection of the public interest requires continued regulation of telecommunications carriers and services for the foreseeable future" (220 ILCS 5/13—102(d) (West 1992)). In accordance with these findings, the legislature has declared as the policy of the State that "telecommunications services should be available to all Illinois citizens at just, reasonable and affordable rates and that such services should be provided as widely and economically as possible in sufficient variety, quality, quantity and reliability to satisfy the public interest." 220 ILCS 5/13—103(a) (West 1992); see also 220 ILCS 5/1—102 (West 1992) (finding that the public interest requires "the provision of adequate, efficient, reliable, environmentally safe and least-cost public utility services").

The liability that the plaintiffs seek to impose on Bell is virtually unlimited, and Bell's entire customer base would ultimately bear that cost. Under existing rate of return regulation, damages awarded in circumstances such as these would find themselves translated into higher tariffs: Bell would recover its costs of compensating affected customers through the rates it charges all its customers. (See *Bulbman, Inc. v. Nevada Bell* (1992), 108 Nev. 105, 108-09, 825 P.2d 588, 590-91.) Giving effect to Bell's liability limitation does not mean, however, that customers can never be made whole for disruptions in telephone service. Corporate users that wish to be protected against the risk of service outages may obtain business interruption insurance to compensate them for these losses.

Notably, the cost of bearing the risk of loss posed by

service disruptions is not a matter that can be varied by individual contract. Illinois Bell is required to make its services available to all; regulated rates are not negotiable, and Bell may not charge different customers different rates for the same service. (220 ILCS 5/8—101 (West 1992).) Allowing the plaintiffs recovery here, without giving effect to the liability limitation in Bell's tariff, would turn the regulatory process on its head, granting telephone customers the advantage of the low rates obtained through the assurance to Illinois Bell that it will incur no liability for service disruptions, without enforcing the customers' corresponding duty to insure themselves against that loss, if they seek protection of that type. See *Southwestern Sugar & Molasses Co. v. River Terminals Corp.* (1959), 360 U.S. 411, 418, 3 L. Ed. 2d 1334, 1341, 79 S. Ct. 1210, 1215.

For these reasons, section 5—201 of the Public Utilities Act must not be read in isolation, but must instead be considered in the context of the entire legislative scheme of which it forms a part. Thus, rather than find an irreconcilable conflict between the liability limitation in Illinois Bell's tariff and the statutory cause of action recognized in section 5—201, as the plaintiffs urge us to do, we should attempt to reconcile the two provisions. Accordingly, I would limit recovery under section 5—201 "to those situations in which an award of damages would not hinder or frustrate the commission's declared supervisory and regulatory policies," as the Supreme Court of California has recognized in a similar context. *Waters v. Pacific Telephone Co.* (1974), 12 Cal. 3d 1, 5, 523 P.2d 1161, 1162, 114 Cal. Rptr. 753, 754.

To say that the liability limitation in the tariff means nothing because the statute permits recovery "for all loss, damages or injury" ignores the role of the tariff in the statutory scheme. The legislature has expressed a strong public policy in favor of maintaining

utility rates at reasonable levels, and the regulatory process is designed to ensure the continued availability of telephone services at prices affordable to all. The liability exclusion found in Illinois Bell's tariff plays an important part in keeping rates low; if Bell is to bear the risk of liability for damages of the type sought here, then it will have to charge all its customers higher rates for the services it provides.

We are not writing on a blank slate. As I have noted, liability limitations like the one at issue here have been in force for more than half a century, and it seems self-evident that Bell would have charged higher rates for telephone service if the tariffs had not contained these provisions. Moreover, the appellate court and the Commerce Commission have both given effect to Bell's liability limitations, rejecting customers' claims for damages beyond those expressly authorized by its tariffs. (*J. Meyer & Co. v. Illinois Bell Telephone Co.* (1980), 88 Ill. App. 3d 53; *Sarelas v. Illinois Bell Telephone Co.* (1963), 42 Ill. App. 2d 372; *Menco Corp. v. Illinois Bell Telephone Co.* (Illinois Commerce Commission Oct. 17, 1984), No. 84—0277.) Under well-established principles of statutory construction, the interpretation of a statute by the administrative agency charged with its enforcement is entitled to deference (*Blum v. Bacon* (1982), 457 U.S. 132, 141, 72 L. Ed. 2d 728, 736, 102 S. Ct. 2355, 2361; *City of Decatur v. American Federation of State, County, & Municipal Employees, Local 268* (1988), 122 Ill. 2d 353, 361), and the Commission's decision giving effect to Bell's liability limitation must be accorded appropriate weight.

Notably, too, the legislature had the benefit of these judicial and administrative decisions when it revised and recodified the provisions of the predecessor to the Public Utilities Act, effective January 1, 1986. At that time, the legislature made no change in the language of

what was formerly section 73 of "An Act concerning public utilities" (Ill. Rev. Stat. 1983, ch. 111²/₃, par. 77) and recodified the provision as section 5—201 of the Public Utilities Act (Ill. Rev. Stat. 1985, ch. 111²/₃, par. 5—201). Apparently the legislature found no inconsistency between that provision and the judicial and administrative interpretations given separately to the liability limitations in Bell's tariffs. The continuation of the text of section 73 in the face of the decisions of the appellate court and Commerce Commission is evidence of the legislature's acquiescence in those rulings. See *Union Electric Co. v. Illinois Commerce Comm'n* (1979), 77 Ill. 2d 364, 380-81; Joint Committee on Public Utility Regulations (April 1984), at 4 ("[C]hanges made for the purpose of this reorganization should not have the effect of amending the policies of the present Act or detracting in any way from applicable administrative or judicial interpretations").

Changes are, of course, coming to the world of telecommunications: technological advances, increased competition at every level, different models of ratemaking and regulation. (See, *e.g.*, 220 ILCS 5/13—506.1 (authorizing Commerce Commission to adopt alternative forms of regulation for telecommunications carriers); 13—509 (allowing telecommunications carriers providing competitive services to negotiate with customers over terms or rates of service without regard to tariff provisions) (West 1992).) The traditional justifications for enforcing liability limitations such as the one at issue here may lose strength as these changes occur. (See Note, *Limitation of Liability for Interruption of Service for Regulated Telephone Companies: An Outmoded Protection?*, 1993 U. Ill. L. Rev. 629, 644-47.) Under the law controlling this case, however, the limitation on liability contained in Bell's filed tariff is an important element in the setting of its rates. As Bell

observes, appropriate rates cannot be determined without taking into account the utility's potential liability, and Bell's regulated rates rest in part on the tariff's liability limitation. To ignore that provision, as the plaintiffs suggest, would frustrate the legislative scheme applicable here.

In sum, I believe that Bell's tariff precludes recovery by the plaintiffs, and I concur in the judgment of the court. Given this conclusion, we have no need to consider in this case the independent question whether this court's decision in *Moorman Manufacturing Co. v. National Tank Co.* (1982), 91 Ill. 2d 69, applies to the cause of action authorized by section 5—201 of the Public Utilities Act.

JUSTICE HARRISON, dissenting:

The question before us in this Rule 316 (134 Ill. 2d R. 316) appeal is whether a statutory action for civil damages brought against Illinois Bell pursuant to section 5—201 of the Public Utilities Act (220 ILCS 5/5—201 (West 1992)) is barred by the exculpatory provision of a tariff filed by the company with the Illinois Commerce Commission and by the "economic loss" doctrine articulated by this court in *Moorman Manufacturing Co. v. National Tank Co.* (1982), 91 Ill. 2d 69. On Illinois Bell's combined motion to dismiss (735 ILCS 5/2—615 (West 1992)) and for summary judgment (735 ILCS 5/2—1005 (West 1992)), the circuit court of Cook County held that it was.

The appellate court affirmed, with one justice dissenting. (234 Ill. App. 3d 457.) This court then reversed and remanded for further proceedings, but subsequently granted Illinois Bell's petition for reconsideration. Although the company's petition raised no new matters, our court has now decided to change its position and affirm. For the reasons which follow, I continue to adhere to my view that we should reverse and remand

to the circuit court for further proceedings. I therefore dissent.

Illinois Bell's combined motion before the circuit court was decided solely on the basis of the well-pleaded factual allegations contained in plaintiffs' second-amended joint complaint. According to those allegations, which the parties agree we must accept as true, Illinois Bell provides the only local exchange telecommunications service within the western and southwestern suburbs of Chicago. Integral to that service are five "switching stations" which automatically route and direct telephone traffic. These five stations handle all of the local exchange telephone service for substantially all of the Chicago metropolitan area. They also handle substantially all of the long-distance telephone service for the other carriers that service Chicago.

The switching station located in Hinsdale, Illinois, serves as the gateway or hub of telephone service within Chicago's western and southwestern suburbs. This is a rapidly expanding area embracing many residential communities, major companies with regional or national headquarters, and thousands of local merchants and businesses. When fully operational, the Hinsdale station can process approximately 3.5 million calls per day. It accomplishes this using a system which is totally computerized and automated. Because human operators are not needed, the station is often left completely unmanned.

Through advertising, public relations campaigns, promotions and other means, Illinois Bell has aggressively promoted the importance and reliability of its telephone service. By the time the Hinsdale station was constructed, however, Illinois Bell had abandoned the use of backup switching systems that would insure continuous telephone service in the event of a fire or other catastrophe. Accordingly, no such backup existed for the Hinsdale facility.

Based on the experience of other Bell system telephone companies, Illinois Bell knew that a switching station fire could have dire adverse effects on its customers. Nevertheless, the Hinsdale facility had scant protection against fire hazards. Although Illinois Bell installed an automatic fire sensor and alarm, the alarm was not connected to any fire department. It was monitored only at an Illinois Bell office half the State away in Springfield. There was absolutely no automatic fire suppression equipment, even though such equipment was inexpensive, readily available and in common use in most large computer installations. The only fire-fighting equipment of any kind consisted of wall-mounted manual fire extinguishers which were useless when the station was unmanned.

Sunday, May 8, 1988, was one such day when no one was present at the facility. In the middle of the afternoon, a fire broke out. At 3:50 p.m., the automatic fire alarm was triggered. The alarm registered at Illinois Bell's monitoring office in Springfield and continued for nine consecutive minutes, but Illinois Bell took no responsive action. At approximately 4:20 p.m. the fire triggered a second alarm at the monitoring office, but again Illinois Bell took no responsive action. Finally, at 4:58 p.m., an unknown passerby who had noticed smoke pouring from the Hinsdale station alerted the local fire department. Fire fighters arrived at the scene within minutes. By that time, however, the blaze had been raging for over an hour, and the switching equipment was completely destroyed.

As a direct result of the equipment's destruction, telephone service in the western and southwestern suburbs of Chicago was disrupted. Illinois Bell lacked adequate facilities of its own to restore this service on a temporary basis and refused to install emergency equipment which could have promptly restored service,

even though such equipment had been offered to the company by various firms within 72 hours of the fire and was available at reasonable cost. When permanent repairs were initiated by the company, they took over a month to complete. Throughout this period Illinois Bell customers in the affected area were left without telephone service, causing them to suffer "significant expense, lost business, lost profits and serious inconvenience and threats to their health, safety and well-being."

Based upon these events, many of the affected Illinois Bell customers filed class actions pursuant to section 2—801 *et seq.* of the Code of Civil Procedure (735 ILCS 5/2—801 *et seq.* (West 1992)) in the circuit court of Cook County to recover damages from the company. Five such actions were subsequently consolidated by the circuit court pursuant to section 2—1006 of the Code of Civil Procedure (735 ILCS 5/2—1006 (West 1992)), and the plaintiffs in these consolidated actions filed a joint amended complaint. In their complaint, plaintiffs purported to represent

"[a]ll those who on May 8, 1988 were local exchange business or residential customers of Illinois Bell and whose telephone service was halted, disrupted or otherwise adversely affected as a result of the May 8, 1988 fire at the Hinsdale station."

Before the circuit court passed on the question of whether the action should, in fact, be maintained as a class action (735 ILCS 5/2—802(a) (West 1992)), it dismissed the first-amended joint complaint on Illinois Bell's motion on the grounds that it was substantially insufficient in law. This dismissal was without prejudice. Plaintiffs then filed a second-amended joint complaint which contained five counts. Counts I and II asserted a statutory claim for civil damages under section 5—201 of the Public Utilities Act (220 ILCS 5/5—201 (West 1992)). Count III alleged willful and

wanton misconduct, and count IV claimed breach of contract. Count V advanced no new substantive claims, but simply asked for a declaratory judgment (735 ILCS 5/2—701 (West 1992)) that none of the preceding counts was barred by the exculpatory terms of a tariff Illinois Bell had filed with the Illinois Commerce Commission.

On Illinois Bell's motion, the circuit court dismissed counts I through IV as being substantially insufficient in law (735 ILCS 5/2—615 (West 1992)) and granted summary judgment (735 ILCS 5/2—1005 (West 1992)) in favor of Illinois Bell on count V. The customers elected to stand on their pleadings and appealed the dismissal of counts I and II. They also appealed the entry of summary judgment against them on count V. The appellate court affirmed the circuit court's judgment, over the dissent of Justice Scariano, but issued a certificate of importance pursuant to Supreme Court Rule 316 (134 Ill. 2d R. 316). Although we initially reversed and remanded, we subsequently granted Illinois Bell's petition for reconsideration. The matter is therefore before us once again for review.

As just mentioned, counts I and II of plaintiffs' second-amended joint complaint asserted a statutory claim for civil damages pursuant to section 5—201 of the Public Utilities Act (220 ILCS 5/5—201 (West 1992)). That statute, which is applicable to Illinois Bell by virtue of section 13—101 of the Universal Telephone Service Protection Law of 1985 (220 ILCS 5/13—101 (West 1992)), provides:

"In case any public utility shall do, cause to be done or permit to be done any act, matter or thing prohibited, forbidden or declared to be unlawful, or shall omit to do any act, matter or thing required to be done either by any provisions of this Act or any rule, regulation, order or decision of the [Illinois Commerce] Commission, issued under authority of this Act, the public utility shall be liable to the persons or corporations affected thereby for all loss,

damages or injury caused thereby or resulting therefrom, and if the court shall find that the act or omission was wilful, the court may in addition to the actual damages, award damages for the sake of example and by the way of punishment." 220 ILCS 5/5—201 (West 1992).

In count I plaintiffs claimed they were entitled to damages under this statute because their injuries were caused by Illinois Bell's failure to comply with two particular provisions of the Public Utilities Act: section 8—101 (220 ILCS 5/8—101 (West 1992)) and section 8—401 (220 ILCS 5/8—401 (West 1992)). Under section 8—101, Illinois Bell was required to

"furnish, provide and maintain such service instrumentalities, equipment and facilities as shall promote the safety, health, comfort and convenience of its patrons, employees and public and as shall be in all respects adequate, efficient, just and reasonable." (220 ILCS 5/8—101 (West 1992).)

Pursuant to section 8—401, it also had a duty to "provide service and facilities which are in all respects adequate, efficient, reliable and environmentally safe." 220 ILCS 5/8—401 (West 1992).

According to plaintiffs, Illinois Bell violated these two provisions in that it (1) failed to provide adequate, efficient, and reasonable responses to the two fire alarms that went off at the Springfield monitoring office; (2) failed to equip the Hinsdale switching station with adequate, efficient and reasonable fire suppression equipment; (3) failed to provide adequate efficient and reasonable staffing of the Hinsdale station so that the manual fire extinguishers located there could be used in case of fire; (4) failed to provide adequate, efficient and reasonable procedures to be followed by Illinois Bell employees for reporting fires to local fire departments; (5) failed to provide adequate, efficient and reasonable fire alarm systems at the Hinsdale station which would have automatically sounded at the local fire department; (6) failed to provide adequate, efficient and reasonable

training for Illinois Bell personnel who monitored fire alarms at the Hinsdale station; (7) failed to provide adequate, efficient and reasonable back-up switching equipment at the station which could be used in case of fire or other natural disaster there; and (8) failed to install temporary emergency replacement equipment to service the affected area.

As an additional basis for recovery plaintiffs claimed that Illinois Bell should be held liable under section 5—201 of the Act because it violated certain regulations promulgated by the Illinois Commerce Commission. Under those regulations, Illinois Bell was obligated to adopt and pursue a maintenance program aimed at preventing service interruptions (83 Ill. Adm. Code § 730.402(a) (1991)), and to keep "all plant and equipment in the good state of repair consistent with the design capabilities of the plant affected," which includes repairing or replacing "broken, damaged, or deteriorated parts which are no longer serviceable" (83 Ill. Adm. Code § 730.402(b) (1991)). Illinois Bell was also required to

"make reasonable provisions to meet emergencies resulting from failures of lighting or power service, sudden and prolonged increases in traffic, illness or personnel, or *from fire, storm, or other acts of God* ***." (Emphasis added.) (83 Ill. Adm. Code § 730.408(a) (1991).)

In count I plaintiffs alleged that Illinois Bell breached these obligations when it failed to take reasonable steps to obtain emergency equipment and facilities to restore service following the fire. Count II incorporated all of count I's allegations, but included the additional charge that Bell's violations of the specified statutes and regulations were "willful" within the meaning of section 5—201 of the Public Utilities Act.

In affirming the dismissal of both counts I and II, the appellate court held that plaintiffs were barred from recovering consequential damages from Illinois Bell by

virtue of the exculpatory provisions of a tariff filed by the company with the Illinois Commerce Commission. That tariff provides:

"The liability of the Company for damages arising out of mistakes, omissions, interruptions, delays, errors or defects in transmission occurring in the course of furnishing service or other facilities, and not caused by the negligence of customer, shall in no event exceed an amount equivalent to the proportionate charge to the customer for the period of service during which such mistake, omission, interruption, delay, error or defect in transmission occurs. No other liability shall in any case attach to the Company."

The appellate court correctly observed that similar exculpatory provisions have been found to preclude the recovery of consequential damages for interruption of phone service in both administrative proceedings before the Commerce Commission (*Menco v. Illinois Bell Telephone Co.* (Illinois Commerce Commission October 17, 1984), No. 84—0277), and civil court actions (*J. Meyer & Co. v. Illinois Bell Telephone Co.* (1980), 88 Ill. App. 3d 53; *Sarelas v. Illinois Bell Telephone Co.* (1963), 42 Ill. App. 2d 372). In contrast to the present case, however, none of the authorities invoked by the appellate court involved statutory damages claims brought under section 5—201 of the Public Utilities Act. This distinction is critical, for as Justice Scariano noted in his dissent, that statute clearly and unambiguously makes Illinois Bell liable for "all loss, damages or injury" caused by or resulting from Bell's violation of the Act and the Commission's regulations, and further provides for the recovery of punitive, as well as actual, damages where, as alleged here, the violation is willful. 234 Ill. App. 3d at 469-70 (Scariano, J., dissenting).

Nothing in the Public Utilities Act or the Commission's regulations authorizes a utility to exempt itself from this liability by means of a tariff. Nor may any such exemption be conferred on a public utility by the

Commerce Commission. This is so because, as a creature of the legislature, the Commerce Commission derives its authority solely from the statute creating it, *i.e.*, the Public Utility Act, and any acts it takes or orders it makes inconsistent with that act are void. *City of Chicago v. Illinois Commerce Comm'n* (1980), 79 Ill. 2d 213, 217-18.

In an effort to avoid this conclusion, Illinois Bell makes the somewhat startling assertion that the exculpatory provision in the tariff does not, in fact, conflict with the terms of section 5—201 of the Act. It does not conflict, according to the company, because the tariff and the tariff alone defines its obligations to its customers. This contention is completely untenable. As plaintiffs have alleged in their second-amended joint complaint, numerous duties are expressly imposed on Illinois Bell by the Public Utilities Act. To say such duties are not controlling is tantamount to holding that by filing a tariff and obtaining the approval, or at least acquiescence of the Commerce Commission, a utility has the power to nullify the regulatory scheme enacted by the General Assembly. For the reasons just stated, the law will not countenance such a result. By any reasonable construction of the statutory framework, tariffs are intended to ensure that utilities comply with the Public Utilities Act, not to provide them an opportunity for evading it.

As an additional basis for giving the tariff preclusive effect over section 5—201 of the Act, the appellate court reasoned that if Illinois Bell were not permitted to limit its liability in cases such as this, its potential liability might be so great that its ability to provide telephone service at reasonable rates would be compromised. Plaintiffs have specifically alleged, however, that Bell is a profitable corporation "well able to afford to pay plaintiffs *** the amount of damages they suffered

without having to raise rates to fund such payment." The appellate court had no legitimate basis for ignoring this allegation, for, as I noted at the outset of this dissent, this matter is still at the pleading stage, and the parties agree that all well-pleaded factual allegations must be taken as true.

The appellate court's reasoning must also fail because it forgets that the Public Utility Act's remedial scheme is a legislative creation. It was for the General Assembly to balance the policy considerations at stake, and there is no basis for assuming that the General Assembly did not fully appreciate how utilities such as Illinois Bell might be affected by the enactment of section 5—201. Now that the legislature has spoken clearly and unambiguously, the court's only legitimate function is to enforce the law as enacted. The law should not be rewritten to make it consistent "with the court's idea of orderliness and public policy." *Kozak v. Retirement Board of the Firemen's Annuity & Benefit Fund* (1983), 95 Ill. 2d 211, 220.

For similar reasons I find no merit to the appellate court's alternative holding that counts I and II of the second-amended joint complaint were properly dismissed pursuant to the "economic loss" doctrine articulated by this court in *Moorman Manufacturing Co. v. National Tank Co.* (1982), 91 Ill. 2d 69. That doctrine holds that economic losses, defined as those damages sought " 'for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits—without any claim of personal injury or damage to other property ***' [citation] as well as the 'diminution in the value of the product because it is inferior in quality and does not work for the general purposes for which it was manufactured and sold' " (*Moorman*, 91 Ill. 2d at 82), are not recoverable in tort. *Anderson Electric, Inc. v. Moorman, Ledbetter Erection Corp.* (1986), 115 Ill. 2d 146, 149.

Plaintiffs protest that this doctrine is inapplicable because the interruption of their phone service did constitute damage to "other property." It is unnecessary to address this contention, however, for even if plaintiffs' characterization of their loss is incorrect, their right to recovery is not defeated. Under the express language of section 5—201, it does not matter whether the loss is "economic" in nature or not. By its terms, that statute permits recovery for *all* loss, damages or injury caused by or resulting from a utility's violation of the Public Utility Act or Commission regulations. Where, as here, the damages sought are expressly authorized by statute, *Moorman* does not apply. *Warren v. LeMay* (1986), 142 Ill. App. 3d 550, 579.

Although it acknowledged that no reported decision has ever held otherwise, the appellate court reached a contrary conclusion by invoking the principle that statutes which are in derogation of the common law will not be construed as abrogating common tort law principles such as *Moorman* unless the statutes plainly show that that was the legislature's intention. (See *Barthel v. Illinois Central Gulf R.R. Co.* (1978), 74 Ill. 2d 213, 221.) What the appellate court majority failed to heed is Justice Scariano's reminder that the best indicator of legislative intent is the language used. The language used here could not be any clearer in authorizing the damages plaintiffs seek. It is never proper for a court to depart from the plain language of a statute by reading into it exceptions, limitations, or conditions which conflict with such clearly expressed legislative intent. *Certain Taxpayers v. Sheahen* (1970), 45 Ill. 2d 75, 84.

By invoking *Moorman* to limit the language of section 5—201, the appellate court also overlooked two other basic rules of statutory construction. In interpreting a statute a court must look at the state of the law as it existed at the time of a statute's enactment. (*Illinois*

*Bell Telephone Co. v. Allphin* (1982), 93 Ill. 2d 241, 249.) Correspondingly, "[t]he legislative intent that controls in the construction of a statute has reference to the legislature which passed the given act." *People v. Boreman* (1948), 401 Ill. 566, 572.

Section 5—201 has been in effect in one form or another since the early part of the century. The *Moorman* doctrine, however, was not announced by our court until 1982. At the time section 5—201 was first enacted, the legislature could therefore have had no possible reason to believe that it needed to account for *Moorman*'s restrictions. *Moorman* did not even exist.

There is no dispute that the legislature may change existing common law by enacting new legislation. The courts, however, have no coordinate right to change existing legislation by pronouncing new principles of common law. By applying *Moorman* to limit the plain language of section 5—201, that is precisely what the appellate court here did.

As support for its position, the appellate court relied on this court's decision in *Barthel*, 74 Ill. 2d 213. That case, however, did not make the errors I have just discussed and involved substantially different circumstances. *Barthel* was concerned with the question of whether contributory negligence could be raised by the defendant in an action under the predecessor provision to section 5—201. Under the law at that time, a plaintiff's contributory negligence was a complete bar to recovery. The plaintiffs in *Barthel* argued that this defense should not apply to actions under the statute and that the statute was meant to impose strict liability on offending public utilities.

This court rejected plaintiffs' argument, holding that the social policy requiring imposition of strict liability did not come into play with respect to the Public Utilities Act (*Barthel,* 74 Ill. 2d at 222) and that contrib-

utory negligence was a defense under that statute, just as it was in various other statutory actions (*Barthel*, 74 Ill. 2d at 224-25). In no way, however, did *Barthel* purport to limit the *type* of damages recoverable under the Act, as the appellate court did in this case, nor did it sanction the application of new common law principles to legislation already in existence.

Although the majority opinion of this court advances various legal arguments in support of the appellate court's judgment, the true basis for its result may be reflected in its conclusion that if plaintiffs prevail, they "could well end up owning the telephone company." (161 Ill. 2d at 246.) I for one see no particular objection to such a result. If the plaintiff customers were in control of the system, they might well take better care of it. At the very least, they might have the sense to call the fire department before a major link in the network is reduced to a mass of melted wire. In any case, it is not our function to protect the telephone company, or any party, from the consequences of its misconduct. We exist not to defend corporate status quo, but to interpret and apply the law.

For the foregoing reasons, I would hold that the circuit court erred in dismissing counts I and II of plaintiffs' second-amended joint complaint, and in granting summary judgment for Illinois Bell on count V of that complaint. Accordingly, I would reverse the judgments of the circuit court and the appellate court and remand this cause to the circuit court for further proceedings. I therefore dissent.

CHIEF JUSTICE BILANDIC joins in this dissent.