NOTICE: Under Supreme Court Rule 367 a party has 21 days after the

filing of the opinion to request a rehearing. Also, opinions are

subject to modification, correction or withdrawal at anytime prior

to issuance of the mandate by the Clerk of the Court. Therefore,

because the following slip opinion is being made available prior to

the Court's final action in this matter, it cannot be considered

the final decision of the Court. The official copy of the following

opinion will be published by the Supreme Court's Reporter of

Decisions in the Official Reports advance sheets following final

action by the Court.

                                    

           Nos. 80460, 80535 cons.--Agenda 26--September 1996.

                     In re CHICAGO FLOOD LITIGATION.

                    Opinion filed February 20, 1997.

                                    

     JUSTICE FREEMAN delivered the opinion of the court:

     In April 1992, the underground freight tunnel system in the

central business district of Chicago flooded. Numerous named

plaintiffs (class plaintiffs) represent individuals and businesses

that claim property damage and economic loss as a result. ITT

Hartford (Hartford), the subrogee of several additional claimants,

opted out of the certified class. Class plaintiffs and Hartford

each brought an action in the circuit court of Cook County against

defendants, the City of Chicago (City) and the Great Lakes Dredge

and Dock Company (Great Lakes). Class plaintiffs and Hartford

sought damages for their various alleged injuries.

     The trial court granted in part and denied in part the City's

and Great Lakes' motions to dismiss. 735 ILCS 5/2--615, 2--619

(West 1994). The court also certified several questions for

interlocutory appeal (155 Ill. 2d R. 308), and found that there was

no just cause to delay appeal of several additional issues (155

Ill. 2d R. 304(a)).

     In an unpublished order (Nos. 1--93--207, 1--93--209, 1--93--

318, 1--93--1570, 1--93--1602, 1--93--1848, 1--93--1902, 1--94--

387, 1--94--388 cons. (unpublished order under Supreme Court Rule

23)), the appellate court upheld all but two of the trial court's

rulings. We allowed class plaintiffs' and Hartford's separate

petitions for leave to appeal (155 Ill. 2d R. 315) and consolidated

the causes for review; the City cross-appeals (155 Ill. 2d R.

318(a)). We now affirm the appellate court in part and reverse in

part.

                                BACKGROUND

     A motion to dismiss under either section 2--615 or section 2--

619 of the Code of Civil Procedure (735 ILCS 5/2--615, 2--619 (West

1994)) admits all well-pled allegations in the complaint and

reasonable inferences to be drawn from the facts. Anderson v.

Anchor Organization for Health Maintenance, 274 Ill. App. 3d 1001,

1012 (1995); Pechan v. DynaPro, Inc., 251 Ill. App. 3d 1072, 1083-

84 (1993); Davis v. Weiskopf, 108 Ill. App. 3d 505, 509 (1982). The

complaints allege as follows. An old, underground freight tunnel

system (tunnel) is located under the central business district of

Chicago, commonly known as the Loop, and the Chicago River. Many

buildings in the Loop are connected directly or indirectly to the

tunnel. Before 1959, the tunnel was used to transport freight in

the Loop. Since 1959, the City has owned the tunnel and, since the

1970s, has leased the tunnel to a number of utility and telecom-

munication companies to carry their service lines. The tunnel

crosses under the Chicago River at different locations, including

near the Kinzie Street bridge.

     In May 1991, the City entered into a contract with Great

Lakes, which provided that Great Lakes would remove and replace

wood piling clusters at five Chicago River bridges, including the

Kinzie Street bridge. The contract warned Great Lakes not to drive

the pilings "at any other location than that specified by the City

*** [because] even slight position changes may cause serious damage

to various underground *** structures." The contract further

provided that if Great Lakes failed to heed this warning, Great

Lakes would be liable to repair such damages at its own expense.

     By September 1991, Great Lakes informed the City that it had

fully completed the work. However, Great Lakes had installed the

pilings at the Kinzie Street bridge in a location other than

originally designated in the contract. During pile driving at the

bridge, Great Lakes caused a breach in the tunnel wall by

physically breaking, weakening, or creating excessive pressure on

the tunnel wall.

     In January 1992, a television crew using the tunnel discovered

the breach in the tunnel wall at the Kinzie Street bridge. By

February 1992, the television crew notified the City of the tunnel

damage. During March and early April 1992, City employees inspected

the tunnel, photographed the damage, and recommended immediate

repairs.

     On or about April 13, 1992, the tunnel breach opened. In a

sudden torrent and continuing flow, the Chicago River rushed into

the tunnel and, ultimately, into buildings connected to the tunnel.

Approximately 200,000 persons were evacuated from numerous Loop

buildings. On April 14, the Governor of the State of Illinois

declared the Loop and surrounding areas a state disaster area. The

next day, the President of the United States declared the area a

federal disaster area. Thousands of Loop building occupants were

unable to return to their respective places of business for days or

weeks thereafter while emergency repairs and cleaning took place.

Class plaintiffs and Hartford sought damages for various alleged

losses proximately caused by the flood, including: injury to their

property; lost revenues, sales, profits, and good will; lost wages,

tips, and commissions; lost inventory; and expenses incurred in

obtaining alternate lodging.

                        Class Plaintiffs' Complaint

     Class plaintiffs' complaint contains 10 counts, five of which

are directed against the City. Class plaintiffs alleged that the

City failed to: (1) properly contract for, administer, and

supervise Great Lakes' pile driving activities; (2) exercise

ordinary care to maintain, repair, and protect the tunnel both

before and after the breach (but only up to the time of the actual

flood); and (3) warn class plaintiffs of the dangerous condition

caused by the tunnel breach when the City learned of it. Class

plaintiffs allege that these acts constitute willful and wanton

misconduct (count III) and negligence (count IV). Class plaintiffs

also alleged that the City and Great Lakes were engaged in

abnormally dangerous (count VII) and ultrahazardous (count VIII)

activities--pile driving and maintaining the tunnel--and were

strictly liable for any resulting damages. Class plaintiffs also

alleged that they were the third-party beneficiaries of the

contract between the City and Great Lakes, which both parties

breached (count V). Class plaintiffs subsequently voluntarily

dismissed this count.

     The trial court granted the City's motion to dismiss the

strict tort liability counts. The court also ruled that the Moorman

doctrine (see Moorman Manufacturing Co. v. National Tank Co., 91

Ill. 2d 69 (1982)) barred from recovery those plaintiffs who did

not allege physical property damage, but rather only economic loss.

The court also ruled that the Local Governmental and Governmental

Employees Tort Immunity Act (Tort Immunity Act) (745 ILCS 10/1--101

et seq. (West 1994)) immunized much of the City's alleged negli-

gence. As part of class plaintiffs' appeal, the trial court

certified the following questions for review (155 Ill. 2d R. 308):

(1) whether the City's proprietary use of the tunnel precludes

immunity under the Tort Immunity Act; (2) whether the Tort Immunity

Act immunizes any of the City's alleged failures to adequately

contract for, supervise, or monitor the river piling work; and (3)

whether the Moorman doctrine bars the claims of those plaintiffs

who allege only economic loss. The court also allowed class

plaintiffs to appeal (155 Ill. 2d R. 304(a)) from the dismissal of

the abnormally dangerous and ultrahazardous counts.

     The trial court denied the City's motion to dismiss as to the

failure-to-repair and the failure-to-warn theories in the

negligence count, and the willful and wanton misconduct count. The

court denied the motion also as to those plaintiffs seeking

recovery for perishable inventory lost as a result of interrupted

utility service and for unspecified property damage. As part of the

City's appeal, the trial court certified the following questions

for review: (1) whether the City is not liable to class plaintiffs

as a matter of law for its failure to promptly repair the tunnel or

to warn class plaintiffs of the tunnel damage, because either the

Tort Immunity Act immunizes the City, or the City did not owe class

plaintiffs a duty to perform those acts; (2) whether there is a

willful and wanton exception to the discretionary act immunity

granted to the City by the Tort Immunity Act; and (3) whether the

Moorman doctrine bars the claims of those plaintiffs who seek tort

recovery for loss of perishable inventory and unspecified property

damage.

                           Hartford's Complaint

     Hartford is the subrogee of several additional individuals and

businesses that it insures. Hartford opted out of the certified

class and filed a complaint, which it subsequently amended, against

the City and Great Lakes. Hartford's complaint included a strict

tort liability claim based on an ultrahazardous activity theory and

a nuisance claim.

     The trial court granted the City's and Great Lakes' motion to

dismiss these claims. The court again ruled that pile driving is

not an ultrahazardous activity. The court also dismissed the

nuisance claim as to Hartford's subrogors who did not incur any:

(1) invasion of their property by the flood waters; and (2)

property damage, but rather only an economic loss (Moorman). The

court allowed Hartford to appeal immediately from the dismissal of

these counts (155 Ill. 2d R. 304(a)).

     We note that a federal court, in an admiralty proceeding, has

stayed all flood-related litigation as to Great Lakes. Claims

against Great Lakes fall within federal admiralty jurisdiction and

must be pursued in federal court under the Limitation of Vessel

Owner's Liability Act (46 U.S.C. §181 et seq. (1982)). See Jerome

B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S. ___,

130 L. Ed. 2d 1024, 115 S. Ct. 1043 (1995).

                              Appellate Court

     The appellate court consolidated all of the certified

questions and interlocutory appeals and disposed of them in an

unpublished order (134 Ill. 2d R. 23). Regarding the Tort Immunity

Act, the appellate court upheld the following rulings of the trial

court. The Tort Immunity Act applied to class plaintiffs' and

Hartford's claims regardless of whether the City's acts were

"proprietary" or "governmental." Section 3--108 of the Act

immunized the City for failure to supervise or monitor Great Lakes'

work. Also, section 2--201 of the Act immunized the City for its

decision to replace the pilings, but did not, as a matter of law,

immunize the City for a failure to repair or warn. Reversing the

trial court, the appellate court held that section 2--201 immunizes

the City for willful and wanton misconduct.

     The appellate court upheld the trial court's rulings that the

Moorman doctrine barred the claims of those plaintiffs who alleged

only an economic loss, but did not bar the claims of those

plaintiffs who suffered damage in the form of inventory lost due to

interrupted utility service. Regarding Hartford's nuisance claim,

the appellate court upheld the trial court's denial of recovery for

those plaintiffs who did not suffer a physical invasion of their

property by the flood waters. However, reversing the trial court,

the appellate court held that the Moorman doctrine did not bar an

otherwise proper nuisance claim. The appellate court also upheld

the dismissal of class plaintiffs' and Hartford's abnormally

dangerous or ultrahazardous activities claims. Class plaintiffs,

Hartford, and the City all appeal.

                                DISCUSSION

     When ruling on a motion to dismiss, either for failure to

state a cause of action (735 ILCS 5/2--615 (West 1994)) or because

the claims are barred by other affirmative matter that avoids the

legal effect of or defeats the claim (735 ILCS 5/2--619(a)(9) (West

1994)), the trial court must interpret all pleadings and supporting

documents in the light most favorable to the nonmoving party. The

court should grant the motion only if the plaintiff can prove no

set of facts that would support a cause of action. On appeal,

review is de novo. See Pechan, 251 Ill. App. 3d at 1083; Toombs v.

City of Champaign, 245 Ill. App. 3d 580, 583 (1993). In the present

case, the parties' contentions fall under four main headings: (1)

Tort Immunity Act, (2) Moorman Doctrine, (3) Nuisance, and (4)

Abnormally Dangerous or Ultrahazardous Activity.

                             Tort Immunity Act

     Class plaintiffs contend that the appellate court erred in

holding that: (1) the City's proprietary use of the tunnel does not

preclude immunity under the Tort Immunity Act; (2) the Act

immunizes the City from liability for its alleged failure to

supervise and monitor the river piling work performed by Great

Lakes; and (3) there is no willful and wanton exception to the

discretionary immunity granted to the City by the Act. On cross-

appeal, the City contends that the appellate court erred in holding

that the Act does not immunize the City from liability for

allegedly failing to promptly repair the tunnel or warn class

plaintiffs of the tunnel damage.

                     Governmental/Proprietary Function

     Class plaintiffs allege that the City was engaged in a

proprietary function, as opposed to a governmental function, by

leasing the tunnel to utility and telecommunication companies.

Thus, according to class plaintiffs, the Tort Immunity Act does not

apply to this case, and the City is not immune from liability as a

matter of law.

     The trial court rejected this contention, reasoning that the

Act did away with the governmental/proprietary function

distinction. The appellate court affirmed, relying on its decision

in Corral v. Chicago Park District, 277 Ill. App. 3d 357 (1995). We

agree with the trial and appellate courts.

     Under the doctrine of sovereign or governmental immunity, a

governmental unit is immune from tort liability. The doctrine

originates in the common law principle that "the King can do no

wrong," and the more logical and practical principle that there can

be no legal right against the authority that makes the law on which

the right depends. Burdinie v. Village of Glendale Heights, 139

Ill. 2d 501, 506 (1990) (and authorities cited therein). The

doctrine of sovereign immunity runs counter to the basic concept of

tort law that liability follows negligence. Molitor v. Kaneland

Community Unit District No. 302, 18 Ill. 2d 11, 20 (1959); accord

18 McQuillen on Municipal Corporations §53.02.10, at 131-32 (3d

rev. ed. 1993); C. Rhyne, The Law of Local Government Operations

§32.2, at 1042 (1980).

     To mitigate the harshness and injustice of the sovereign

immunity doctrine, courts and state legislatures developed

exceptions to the rule. A major exception that was engrafted onto

the common law doctrine of sovereign immunity was the

governmental/proprietary function distinction. 18 McQuillen on

Municipal Corporations §53.02.10, at 132 (3d rev. ed. 1993); C.

Rhyne, The Law of Local Government Operations §32.2, at 1042

(1980).

     Under this exception to governmental immunity, when a

municipality performs a governmental function, the municipality is

acting as the arm or agent of the state and, thus, is immune from

liability for the torts committed by its officers and employees.

When the municipality performs a proprietary or corporate function,

the municipality is liable for the tortious conduct of its officers

and employees. Whether a governmental function exists is determined

from the nature of the duty to be discharged or the act to be done.

If the duty or act involves the general public benefit, rather than

a corporate or business undertaking for the municipality's

corporate benefit, then the function is governmental whether the

duty be directly imposed on the municipality or is voluntarily

assumed. Merrill v. City of Wheaton, 379 Ill. 504, 507-08 (1942);

Gebhardt v. Village of LaGrange Park, 354 Ill. 234, 236, 238

(1933); accord 18 McQuillen on Municipal Corporations §§53.23,

53.29 et seq. (3d rev. ed. 1993); C. Rhyne, The Law of Local

Government Operations §32.2, at 1042 (1980).

     This court conceded long ago that the governmental/proprietary

function distinction is vague and difficult to apply. It is not

often easy to determine in a particular case whether the activity

is governmental or proprietary. Roumbos v. City of Chicago, 332

Ill. 70, 74-75 (1928). Further, a study of cases from other states

reveals a wide, unreconcilable divergence as to what functions or

activities are governmental and what are proprietary. Many states

have abandoned the distinction. 18 McQuillen on Municipal

Corporations §53.24.10 (3d rev. ed. 1993); C. Rhyne, The Law of

Local Government Operations §32.2, at 1042-44 (1980).

     However, as we have repeatedly noted, this court abolished

sovereign immunity in 1959. Molitor, 18 Ill. 2d at 21-22. In

response to Molitor, the legislature in 1965 enacted the Tort

Immunity Act. Also, the 1970 Illinois Constitution abolishes the

doctrine of sovereign immunity, except as the legislature may

provide by statute. Ill. Const. 1970, art. XIII, §4. The Tort

Immunity Act adopted the general principle that local governmental

units are liable in tort, but limited this liability with an

extensive list of immunities based on specific government func-

tions. Based on these developments, governmental units are liable

in tort on the same basis as private tortfeasors unless a tort

immunity statute imposes conditions upon that liability. Barnett v.

Zion Park District, 171 Ill. 2d 378, 386 (1996); Burdinie, 139 Ill.

2d at 506-07.

     We have explained that the governmental/proprietary function

distinction was developed as an exception to and engrafted onto the

sovereign immunity doctrine. We have noted that the sovereign

immunity doctrine has been abolished and that a governmental unit

is liable in tort on the same basis as a private tortfeasor absent

an immunity statute. Accordingly, we hold that the

governmental/proprietary function distinction does not preclude the

application of the Tort Immunity Act. See Barnett, 171 Ill. 2d at

387-88; List v. O'Connor, 19 Ill. 2d 337, 340 (1960); Corral v.

Chicago Park District, 277 Ill. App. 3d 357, 361-64 (1995); Smith

v. Godin, 61 Ill. App. 3d 480, 481 (1978).

                           Failure to Supervise

     Class plaintiffs contend that the City negligently failed to

supervise Great Lakes' pile driving. In granting the City's motion

to dismiss, the trial court reasoned that it need not determine

whether the City's alleged negligence was "discretionary" or

"ministerial" because the City's acts were immunized by section 3--

108(a) of the Tort Immunity Act (745 ILCS 10/3--108(a) (West

1994)).

     The appellate court affirmed the dismissal. In addition to

relying on the plain language of section 3--108(a), the court

additionally concluded that the City's supervision of Great Lakes'

pile driving constituted a discretionary activity that immunized

the City from liability. We agree with the appellate court.

     Tort Immunity Act section 3--108(a) provides in pertinent

part:

               "§3--108. (a) Except as otherwise provided by this

          Act *** neither a local public entity nor a public

          employee is liable for an injury caused by a failure to

          supervise an activity on or the use of any public

          property." 745 ILCS 10/3--108(a) (West 1994).

     In interpreting this and every other section of the Act, our

primary goal is to ascertain and give effect to the intent of the

legislature. We seek the legislative intent primarily from the

language used in the Tort Immunity Act. We evaluate the Act as a

whole; we construe each provision in connection with every other

section. If we can ascertain the legislative intent from the plain

language of the Act itself, that intent must prevail, and we will

give it effect without resort to other interpretive aids. We must

not depart from the plain language of the Act by reading into it

exceptions, limitations, or conditions that conflict with the

express legislative intent. Barnett, 171 Ill. 2d at 388-89.

     The language of section 3--108(a) is unambiguous. Therefore,

as the appellate court reasoned, to override the immunity under

that section, class plaintiffs must identify some other provision

of the Tort Immunity Act that otherwise limits that immunity.

     The discretionary immunity doctrine is codified in sections 2-

-109 and 2--201 of the Tort Immunity Act (745 ILCS 10/2--109, 2--

201 (West 1994)). See Snyder v. Curran Township, 167 Ill. 2d 466,

468-69, 473 (1995); see generally D. Baum, Tort Liability of Local

Governments and their Employees: An Introduction to the Illinois

Immunity Act, 1966 U. Ill. L.F. 981, 988-1000. At common law, a

municipality is afforded immunity from liability for the

performance of discretionary acts. However, the municipality is not

immune from liability for the performance of ministerial tasks.

City of Chicago v. Seben, 165 Ill. 371, 377-78 (1897). Although the

abolition of sovereign immunity also meant the demise of the

governmental/proprietary distinction, the discretionary/ministerial

distinction survives. See Mora v. State, 68 Ill. 2d 223, 233-34

(1977), quoting Lusietto v. Kingan, 107 Ill. App. 2d 239, 244

(1969); Eck v. McHenry County Public Building Comm'n, 237 Ill. App.

3d 755, 762-63 (1992); accord 18 McQuillen on Municipal

Corporations §53.04.10 (3d rev. ed. 1993); C. Rhyne, The Law of

Local Government Operations §32.2, at 1044, §32.21, at 1063 (1980).

     This court has explained the discretionary immunity doctrine

as follows:

          "It is well settled, that municipal corporations have

          certain powers which are discretionary or judicial in

          character, and certain powers which are ministerial. ***

          Municipal corporations will not be held liable in damages

          for the manner in which they exercise, in good faith,

          their discretionary powers of a public, or legislative,

          or quasi judicial character. But they are liable to

          actions for damages when their duties cease to be

          judicial in their nature, and become ministerial.

          [Citations.] Official action is judicial where it is the

          result of judgment or discretion. Official duty is

          ministerial, when it is absolute, certain and imperative,

          involving merely the execution of a set task, and when

          the law which imposes it, prescribes and defines the

          time, mode and occasion of its performance with such

          certainty, that nothing remains for judgment or

          discretion. [Citation.] A corporation acts judicially, or

          exercises discretion, when it selects and adopts a plan

          in the making of public improvements, such as

          constructing sewers or drains; but as soon as it begins

          to carry out that plan, it acts ministerially, and is

          bound to see that the work is done in a reasonably safe

          and skillful manner." Seben, 165 Ill. at 377-78.

     Class plaintiffs contend that once the City approved the pile

driving plan, its actions ceased to be discretionary and became

ministerial. Thus, according to class plaintiffs, the City is

liable for its alleged negligent supervision of Great Lakes.

     We agree with the appellate court that the City's supervision

of Great Lakes's pile driving was discretionary rather than

ministerial. The cases recognize "that, depending upon the

situation, what might be considered a repair can be a discretionary

matter." Kennell v. Clayton Township, 239 Ill. App. 3d 634, 641

(1992), citing Lusietto, 107 Ill. App. 2d at 244. In the present

case, the contract between the City and Great Lakes provided that

"the contractor shall not drive the piles at any other location

than that specified by the City," and authorized the City to change

its specifications. Thus, the City retained the discretion to

locate the pilings in any location it thought best. See Lusietto,

107 Ill. App. 2d at 244. This was a matter within the City's

discretion for which there is immunity under the Act.

                       Willful and Wanton Misconduct

     Class plaintiffs alleged that the City's acts constituted

willful and wanton misconduct. The trial court denied the City's

motion to dismiss, concluding that Tort Immunity Act section 2--201

did not afford the City discretionary immunity. The court ruled

that section 2--201 contained an exception for willful and wanton

misconduct. The appellate court reversed, holding that section 2--

201 does not contain an exception for willful and wanton

misconduct. We agree with the appellate court.

     Section 2--201 provides as follows:

               "§2--201. Except as otherwise provided by Statute,

          a public employee serving in a position involving the

          determination of policy or the exercise of discretion is

          not liable for an injury resulting from his act or

          omission in determining policy when acting in the

          exercise of such discretion even though abused." 745 ILCS

          10/2--201 (West 1994).

     The plain language of section 2--201 is unambiguous. That

provision does not contain an immunity exception for willful and

wanton misconduct. Where the legislature has chosen to limit an

immunity to cover only negligence, it has unambiguously done so.

Since the legislature omitted such a limitation from the plain

language of section 2--201, then the legislature must have intended

to immunize liability for both negligence and willful and wanton

misconduct. See Barnett, 171 Ill. 2d at 391-92; West v. Kirkham,

147 Ill. 2d 1, 6-7 (1992). Cases holding to the contrary (e.g.,

Barth v. Board of Education, 141 Ill. App. 3d 266, 272-74 (1986)

(holding that section 2--201 did not immunize willful and wanton

misconduct)) are overruled on this point.

                         Failure to Repair or Warn

     The trial court ruled that section 2--201 of the Act did not

afford the City discretionary immunity for allegedly failing to

promptly repair the tunnel or to warn class plaintiffs of the

tunnel breach. The trial court noted class plaintiffs' allegations

that the City "did nothing" to repair the tunnel or to warn class

plaintiffs. The trial court reasoned that section 2--201 affords

immunity only to the exercise of discretion and not for failing to

act.

     The appellate court affirmed. The appellate court reasoned

that it could not find the City immune under section 2--201 as a

matter of law because the record lacked facts as to "determinations

regarding the decisions or omissions the City made. It must be

ascertained what decisions were made, when they were made, by whom,

and in what capacity."

     We disagree with the trial and appellate courts. Class

plaintiffs do not allege that there was any prescribed method for

how to repair the tunnel and how quickly, or how to warn class

plaintiffs of the tunnel breach. Thus, the City's actions cannot be

considered ministerial. See Seben, 165 Ill. at 378.

     On the contrary, as the City notes, the City had to make

several decisions following its notice of the tunnel breach. Such

decisions included who would repair the tunnel, i.e., Great Lakes,

the City itself, or an independent contractor; if an independent

contractor, then how would the contractor be hired and on what

terms. As to the failure-to-warn claim, the City had to decide

whether warning the public would cause panic and, if so, whether

that warning was justified. All of these decisions were within the

City's discretion, which is afforded immunity against liability.

                                Conclusion

     In sum, we answer the certified questions as follows. The

City's proprietary use of the tunnel does not preclude the

application of the Tort Immunity Act. Also, the City is afforded

discretionary immunity against liability for any alleged negligence

in failing to supervise or monitor Great Lakes' pile driving, for

any alleged willful and wanton misconduct, and for any alleged

negligence in failing to promptly repair the tunnel or warn class

plaintiffs of the tunnel damage.

                             Moorman Doctrine

     Class plaintiffs next contend that the appellate court erred

in holding that the Moorman doctrine bars recovery for those

plaintiffs who incurred solely economic losses. On cross-appeal,

the City contends that the appellate court erred in holding that

Moorman does not bar recovery for those plaintiffs who: (1) lost

perishable inventory as a result of interrupted electrical service,

and (2) incurred "unspecified" property damage. We address these

certified questions based on their importance and in furtherance of

our responsibility to maintain a sound and uniform body of

precedent. 134 Ill. 2d R. 366(a)(5).  Our answers to these

certified questions do not affect the applicability of the Tort

Immunity Act to these claims.

                          Solely Economic Losses

     Pursuant to Moorman Manufacturing Co. v. National Tank Co., 91

Ill. 2d 69 (1982), the trial court barred from recovery those

plaintiffs who did not allege physical property damage, but rather

only economic loss. The appellate court affirmed, and we agree.

     At common law, solely economic losses are generally not

recoverable in tort actions. In re Illinois Bell Switching Station

Litigation, 161 Ill. 2d 233, 240 (1994). The economic loss rule, as

a general proposition, is "the prevailing rule in America" (4 F.

Harper, F. James & O. Gray, Torts §25.18A, at 619 (2d ed. 1986)),

and is supported by "the vast majority of commentators and cases"

(Moorman, 91 Ill. 2d at 87-88).

     One of the policies behind the economic loss rule is the

recognition that the economic consequences of any single accident

are virtually limitless. As the State notes, "[i]f defendants were

held liable for every economic effect of their negligence, they

would face virtually uninsurable risks far out of proportion to

their culpability, and far greater than is necessary to encourage

potential tort defendants to exercise care in their endeavors." The

economic loss rule avoids the consequences of open-ended tort

liability. See In re Illinois Bell Switching Station Litigation,

161 Ill. 2d at 246-47; Moorman, 91 Ill. 2d at 88; 4 F. Harper, F.

James & O. Gray, Torts §25.18A, at 622-23 (2d ed. 1986).

     In Moorman, this court enunciated the economic loss rule, and

held that a products liability plaintiff cannot recover solely

economic loss under the tort theories of strict liability,

negligence, and innocent misrepresentation. Moorman, 91 Ill. 2d at

91. This court described economic loss as " `damages for inadequate

value, costs of repair and replacement of the defective product, or

consequent loss of profits--without any claim of personal injury or

damage to other property ***' [citation]." (Emphasis added.)

Moorman, 91 Ill. 2d at 82.

     In Anderson Electric, Inc. v. Ledbetter Erection Corp., 115

Ill. 2d 146 (1986), this court applied the economic loss rule to

claims that services were performed negligently. This court also

held that "[a] plaintiff seeking to recover purely economic losses

due to defeated expectations of a commercial bargain cannot recover

in tort, regardless of the plaintiff's inability to recover under

an action in contract." Anderson, 115 Ill. 2d at 153.

     This court in Moorman articulated three exceptions to the

economic loss rule: (1) where the plaintiff sustained damage, i.e.,

personal injury or property damage, resulting from a sudden or

dangerous occurrence (Moorman, 91 Ill. 2d at 86); (2) where the

plaintiff's damages are proximately caused by a defendant's

intentional, false representation, i.e., fraud (Moorman, 91 Ill. 2d

at 88-89); and (3) where the plaintiff's damages are proximately

caused by a negligent misrepresentation by a defendant in the

business of supplying information for the guidance of others in

their business transactions (Moorman, 91 Ill. 2d at 89). See In re

Illinois Bell Switching Station Litigation, 161 Ill. 2d at 240-41.

None of these exceptions are present in this case.

     Class plaintiffs complain that the application of the economic

loss rule to the present case "permits identically situated

plaintiffs in the same case to be treated differently for recovery

of their damages based solely on the fortuity that one may have

suffered property damage along with economic damage." However, the

tort recovery requirement of injury to person or property is not a

"fortuity." As we explained in In re Illinois Bell Switching

Station Litigation, 161 Ill. 2d at 241:

          "The Moorman holding is bottomed upon the theory that

          tort law affords a remedy for losses occasioned by

          personal injuries or damage to one's property, but

          contract law and the Uniform Commercial Code offer the

          appropriate remedy for economic losses occasioned by

          diminished commercial expectations not coupled with

          injury to person or property. The Moorman court concluded

          that qualitative defects are best handled by contract

          rather than tort law. Tort law [is] `appropriately suited

          for personal injury or property damage resulting from a

          sudden or dangerous occurrence' whereas the remedy for a

          `loss relating to a purchaser's disappointed expectations

          due to deterioration, internal breakdown or nonaccidental

          cause *** lies in contract.' Moorman, 91 Ill. 2d at 86."

     Class plaintiffs also characterize the flood as "sudden" or

"calamitous." Thus, according to class plaintiffs, "under the

recognized exception to Moorman for sudden, calamitous events ***

the Courts below should have ruled as a matter of law that Moorman

does not apply to this case and is not a bar to economic damages."

     We cannot accept this argument. As we earlier explained, an

exception to the economic loss rule is where the plaintiff

sustained personal injury or property damage resulting from a

sudden or dangerous occurrence. Moorman, 91 Ill. 2d at 86. Courts

do not speak of a calamitous, sudden, or dangerous event or

occurrence to avoid the economic loss rule, but rather to

distinguish tort damages from mere economic loss. In other words,

the event, by itself, does not constitute an exception to the

economic loss rule. Rather, the exception is composed of a sudden,

dangerous, or calamitous event coupled with personal injury or

property damage.

     Clearly, the economic loss rule applies to losses incurred

without any personal injury or property damage. Moorman, 91 Ill. 2d

at 82. However, the economic loss rule applies even to plaintiffs

who have incurred physical damage to their property if the damage

is caused by disappointed commercial expectations, gradual

deterioration, internal breakage, or other nonaccidental causes,

rather than a dangerous event. Redarowicz v. Ohlendorf, 92 Ill. 2d

171, 177-78 (1982) (and authorities cited therein); Moorman, 91

Ill. 2d at 86. For damages to be recoverable in tort, the sudden,

dangerous, or calamitous occurrence must still result in personal

injury or property damage. Absent injury to a plaintiff's person or

property, a claim presents an economic loss not recoverable in

tort. See Northern Illinois Gas Co. v. Vincent DiVito Construction,

214 Ill. App. 3d 203, 218-19 (1991). We agree with the trial and

appellate courts that those plaintiffs who did not incur personal

injury or property damage may not recover solely economic losses.

                         Lost Perishable Inventory

     The trial court ruled that the economic loss rule does not bar

recovery in tort for those plaintiffs who lost perishable inventory

as a result of interrupted electrical service. The appellate court

affirmed.  We agree.

     When property damage is caused by disappointed commercial

expectations, the economic loss rule bars recovery in tort.

Redarowicz, 92 Ill. 2d at 177-78. Rather, "[t]o recover in

negligence there must be a showing of harm above and beyond

disappointed expectations." Redarowicz, 92 Ill. 2d at 177. For

example, in Redarowicz, the court held that plaintiff's property

damage was caused by a construction defect, which was a

disappointed commercial expectation. Thus, plaintiff's damages were

solely economic losses. However, the court indicated that had

plaintiff suffered personal injury or other property damage, he

would have been able to recover in tort:

          "This is not a case where defective construction created

          a hazard that resulted in a member of the plaintiff's

          family being struck by a falling brick from the chimney.

          The adjoining wall has not collapsed on and destroyed the

          plaintiff's living room furniture. The plaintiff is

          seeking damages for the costs of replacement and repair

          of the defective chimney, adjoining wall and patio. While

          the commercial expectations of this buyer have not been

          met by the builder, the only danger to the plaintiff is

          that he would be forced to incur additional expenses for

          living conditions that were less than what was bargained

          for." (Emphasis added.) Redarowicz, 92 Ill. 2d at 178.

     In the present case, class plaintiffs do not seek damages for

the loss of continuous electrical service, which is a disappointed

commercial expectation. See In re Illinois Bell Switching Station

Litigation, 161 Ill. 2d at 240-41. Rather, class plaintiffs seek

damages for property loss, in the form of lost perishable

inventory, as a result of a tortious event. Such damages are above

and beyond class plaintiffs' disappointed commercial expectation in

continuous electrical service. Thus, these losses fall outside the

definition of economic loss and are recoverable in tort. See Scott

& Fetzer Co. v. Montgomery Ward & Co., 112 Ill. 2d 378, 388 (1986);

Moorman, 91 Ill. 2d at 86.

                        Unspecified Property Damage

     The trial court also ruled that the economic loss rule did not

bar recovery for those plaintiffs who incurred "unspecified"

property damage. The appellate court affirmed. We disagree.

     Class plaintiffs must plead facts identifying the type of

property damage that they incurred. See People ex rel. Fahner v.

Carriage Way West, Inc., 88 Ill. 2d 300, 308 (1981). The conclusory

allegation of unspecified property damage is insufficient to show

that their damages are recoverable in tort, and cannot withstand a

motion to dismiss. See Knox College v. Celotex Corp., 88 Ill. 2d

407, 426-28 (1981).

     We note class plaintiffs' argument that subsequent discovery

has produced and will continue to produce evidence of the type of

property damage alleged. Thus, according to class plaintiffs, the

City has been or will be advised of the specific property damage

alleged. To dismiss the claims for lack of specificity in the

complaint would be pointless because class plaintiffs would simply

replead with more specificity to conform to currently known facts.

     Of course, this argument lacks merit. This was a section 2--

615 motion to dismiss. The motion attacks only the legal

sufficiency of the complaint. The only matters for the court to

consider in ruling on the motion are the allegations of the

pleadings themselves, rather than the underlying facts. Thus, the

court may not consider affidavits, the products of discovery,

documentary evidence not incorporated into the pleadings, or other

evidence in ruling on a section 2--615 motion. Urbaitis v.

Commonwealth Edison, 143 Ill. 2d 458, 475 (1991); See Barber-Colman

Co. v. A&K Midwest Insulation Co., 236 Ill. App. 3d 1065, 1068-69

(1992).

                                Conclusion

     In sum, we answer the certified questions as follows. The

Moorman doctrine bars the claims of those plaintiffs who allege

only economic loss. However, the Moorman doctrine does not bar the

claims of those plaintiffs who seek tort recovery for loss of

perishable inventory due to interrupted electrical service. Also,

the Moorman doctrine bars the claims of those plaintiffs who seek

tort recovery for unspecified property damage. These answers do not

affect the applicability of the Tort Immunity Act to these claims.

                                 Nuisance

     The trial court dismissed Hartford's nuisance claim as to

those plaintiffs who did not suffer a physical invasion of their

property by the flood waters. The appellate court upheld this

denial of recovery, and Hartford appeals therefrom. Also, the trial

court, pursuant to Moorman, dismissed Hartford's nuisance claim as

to those plaintiffs who did not incur any property damage, but

rather incurred only an economic loss. However, the appellate court

reversed the trial court's application of Moorman to the nuisance

claim. The appellate court held that the Moorman doctrine does not

apply to nuisance claims. On cross-appeal, the City assigns error

to this holding.

                             Physical Invasion

     In its complaint, Hartford alleged that its subrogors were

evacuated from their places of business. Hartford concludes that

the evacuation was an unreasonable and substantial invasion of

plaintiffs' property. Thus, according to Hartford, the complaint

states a cause of action for nuisance as to all of its subrogors.

     A private nuisance is a substantial invasion of another's

interest in the use and enjoyment of his or her land. The invasion

must be: substantial, either intentional or negligent, and

unreasonable. Pasulka v. Koob, 170 Ill. App. 3d 191, 208 (1988);

Statler v. Catalano, 167 Ill. App. 3d 397, 403 (1988). The standard

for determining if particular conduct constitutes a nuisance is the

conduct's effect on a reasonable person. Belmar Drive-In Theatre

Co. v. Illinois State Toll Highway Comm'n, 34 Ill. 2d 544, 547

(1966).

     The type of invasion that nuisance protects differs from the

type of invasion that trespass protects. "A trespass is an invasion

of the interest in the exclusive possession of land, as by entry

upon it. *** A nuisance is an interference with the interest in the

private use and enjoyment of the land, and does not require

interference with the possession." Restatement (Second) of Torts

§821D, Comment d, at 101 (1979); see Colwell Systems, Inc. v.

Henson, 117 Ill. App. 3d 113, 116-17 (1983).

     Agreeing with the trial court, the appellate court held that

"some type of invasion is necessary to state an action for nuisance

and that the physical invasion of water constituted such an

invasion. *** [W]e affirm the trial court's decision to dismiss

only those plaintiffs whose property was not physically invaded by

the flood."

     Hartford assigns error to this holding. Hartford argues that

"[t]he sine qua non of nuisance is not `invasion' of plaintiff's

premises, but rather the use of land by one party that interferes

with the ability of another to enjoy and use his own property.

Invasion may be coincidental to a successful claim for private

nuisance, but it is not mandatory."

     We cannot accept Hartford's contention. It is true that a

private nuisance is described as a substantial interference with

another's use and enjoyment of his or her property. Nonetheless,

that interference is generally and traditionally thought of as an

invasion, albeit a nontrespassory one. See Restatement (Second) of

Torts §821D, at 100 (1979); 3 J. Lee & B. Lindahl, Modern Tort Law

§35.04, at 197 (1990).

     In other words, the interference with the use and enjoyment of

property must consist of an invasion by something perceptible to

the senses. In private nuisance, the typical activity at issue does

not result in a crass physical invasion, as in trespass, but rather

results in an invasion of another's use and enjoyment of his or her

property. 1 F. Harper, F. James & O. Gray, Torts §1.23, at 82-83

(2d ed. 1986); 3 J. Lee & B. Lindahl, Modern Tort Law §35.10, at

203 (1990); see, e.g., Woods v. Khan, 95 Ill. App. 3d 1087, 1090

(1981) ("The invasion of their land [by odors and flies] was both

substantial and intentional").

     This court has repeatedly described a nuisance as "something

that is offensive, physically, to the senses and by such

offensiveness makes life uncomfortable." Rosehill Cemetery Co. v.

City of Chicago, 352 Ill. 11, 30 (1933) (and cases cited therein).

"Typical examples would be smoke, fumes, dust, vibration, or noise

produced by defendant on his own land and impairing the use and

enjoyment of neighboring land." 1 F. Harper, F. James & O. Gray,

Torts §1.23, at 76 (2d ed. 1986); see 3 J. Lee & B. Lindahl, Modern

Tort Law §35.11 (1990). Thus, as the appellate court noted,

Illinois courts have allowed nuisance actions where the alleged

invasion consisted of, e.g., noise and odors (People ex rel.

Traiteur v. Abbott, 27 Ill. App. 3d 277, 282 (1975)), or odors and

flies from a poultry farm (Woods, 95 Ill. App. 3d at 1090); another

example of a nuisance is the shooting of a bullet into another's

home (Statler, 167 Ill. App. 3d at 403).

     In the present case, Hartford does not allege that those

businesses whose property was not physically invaded by the flood

waters suffered any other type of invasion of the use and enjoyment

of their property. There is no allegation of noxious fumes or

disagreeable odors, other types of seepage, disagreeable noises, or

any other type of invasion. We assume that the evacuation of those

businesses was psychologically depressing. However, absent any

perceptible element that would influence the physical senses to

make the location of those businesses less desirable, the complaint

fails to state a cause of action for private nuisance. See

Rosehill, 352 Ill. at 28-30.

                                  Moorman

     Also, pursuant to Moorman, the trial court dismissed

Hartford's nuisance claim as to those plaintiffs who did not incur

any injury to their persons or property, but rather incurred only

economic loss. The appellate court reversed, holding that the

Moorman doctrine does not bar an otherwise proper nuisance claim.

     The trial court correctly recognized that private nuisance is

a tort. Restatement (Second) of Torts §822, Comment a, at 109

(1979); W. Keeton, Prosser & Keeton on Torts §87, at 622 (5th ed.

1984). Although the appellate court recognized this, it

nevertheless held that the rule of Moorman does not apply to

nuisance claims, reasoning that:

          "the application of Moorman to nuisance actions would

          completely gut the very basis of the action in that most

          nuisance claims are based upon a non-physical force such

          as noise, odor, smoke, dust, or even flies. Clearly, in

          these cases, there is no property damage in a Moorman

          context, yet such actions have all been sustained in

          Illinois courts."

     The trial court correctly applied Moorman to Hartford's

nuisance claim. The court recognized the previously discussed

policy behind the economic loss rule that the economic consequences

of any single accident are virtually limitless. As stated earlier,

the economic loss doctrine avoids the consequences of open-ended

tort liability. Moorman, 91 Ill. 2d at 88; see In re Illinois Bell

Switching Station Litigation, 161 Ill. 2d at 246-47. We agree with

the trial court that "there is no reason to treat the tort of nui-

sance *** differently from any other tort." Accord Dick Meyers

Towing Service, Inc. v. United States, 577 F.2d 1023, 1025 n.4 (5th

Cir. 1978); In re Complaint of Marine Navigation Sulphur Carriers,

Inc., 507 F. Supp. 205, 210 (E.D. Va. 1980), aff'd, 638 F.2d 700

(4th Cir. 1981).

     A plaintiff in a private nuisance action may recover all

consequential damages flowing from the injury to the use and enjoy-

ment of his or her person or property. See Schatz v. Abbott

Laboratories, Inc., 51 Ill. 2d 143 (1972). However, recovery of

damages for solely economic loss is not permissible. See 4 F.

Harper, F. James & O. Gray, Torts §25.18A, at 622-23 (2d ed. 1986).

              Abnormally Dangerous or Ultrahazardous Activity

     Class plaintiffs and Hartford next contend that the appellate

court erred in upholding the trial court's dismissal of their

strict tort liability claims. Class plaintiffs and Hartford allege

that pile driving and the maintenance of a tunnel under a riverbed

are abnormally dangerous or ultrahazardous activities.

     A defendant who performs an abnormally dangerous or

ultrahazardous activity (terms which we regard as synonymous) is

subject to liability for harm to the person, land, or chattels of

a plaintiff resulting from the activity, although the defendant has

exercised the utmost care to prevent the harm. Restatement (Second)

of Torts §519, at 34 (1977). This doctrine derives from an English

case, Fletcher v. Rylands, L.R. 3 H.L. 330 (1868). Rylands has come

to stand for the principle that "the defendant will be liable when

he damages another by a thing or activity unduly dangerous and

inappropriate to the place where it is maintained, in the light of

the character of that place and its surroundings." W. Keeton,

Prosser & Keeton on Torts §78, at 547-48 (5th ed. 1984). This

general principle is recognized in Illinois. See, e.g., Miller v.

Civil Constructors, Inc., 272 Ill. App. 3d 263, 265-66, 269 (1995);

Continental Building Corp. v. Union Oil Co., 152 Ill. App. 3d 513,

515-16 (1987); Fallon v. Indian Trail School, Addison Township

School District No. 4, 148 Ill. App. 3d 931, 933-34 (1986).

     This is referred to as "strict" tort liability because the

defendant's negligence or lack thereof is irrelevant. Rather, the

liability arises out of the abnormal danger of the activity itself,

and the risk that it creates, of harm to those in the vicinity. It

is based on a policy of the law that imposes upon anyone, who for

her own purposes creates an abnormal risk of harm to her neighbors,

the responsibility of relieving against that harm when it does in

fact occur. In other words, the defendant's enterprise is required

to pay its way by compensating for the harm it causes because of

its special, abnormal, and dangerous character. Restatement

(Second) of Torts §519, Comment d, at 35 (1977); see G.L. Leasing

Co. v. Union Electric Co., 54 F.3d 379, 386-87 (7th Cir. 1995).

     Section 520 of the Restatement (Second) of Torts sets forth

the following factors to be considered in defining an abnormally

dangerous or ultrahazardous activity:

               "(a) existence of a high degree of risk of some harm

          to the person, land or chattels of others;

               (b) likelihood that the harm that results from it

          will be great;

               (c) inability to eliminate the risk by the exercise

          of reasonable care;

               (d) extent to which the activity is not a matter of

          common usage;

               (e) inappropriateness of the activity to the place

          where it is carried on; and

               (f) extent to which its value to the community is

          outweighed by its dangerous attributes." Restatement

          (Second) of Torts §520, at 36 (1977).

     Illinois courts have traditionally used the terms

"ultrahazardous," "abnormally dangerous," "intrinsically

dangerous," or "inherently dangerous" to refer to "that type of

danger which is inherent in the instrumentality itself at all

times" and not "danger which arises from mere casual or collateral

negligence of others with respect to it under the particular

circumstances. More concisely, it means dangerous in its normal or

nondefective state." Fallon, 148 Ill. App. 3d at 935, citing Clark

v. City of Chicago, 88 Ill. App. 3d 760, 763 (1980). The trial

court correctly noted that this description correlates to the first

and third factors of the Restatement analysis. However, liability

for abnormally dangerous or ultrahazardous activities is not a

matter of these factors alone. All of the factors are to be

considered. Restatement (Second) of Torts §520, Comment h, at 39

(1977).

     Any single factor in section 520 alone is not necessarily

sufficient for the conclusion that an activity is abnormally

dangerous or ultrahazardous. Conversely, it is not necessary that

each factor be present, especially if other factors weigh heavily:

          "The essential question is whether the risk created is so

          unusual, either because of its magnitude or because of

          the circumstances surrounding it, as to justify the

          imposition of strict liability for the harm that results

          from it, even though it is carried on with all reasonable

          care. In other words, are its dangers and

          inappropriateness for the locality so great that, despite

          any usefulness it may have for the community, it should

          be required as a matter of law to pay for any harm it

          causes, without the need of a finding of negligence."

          Restatement (Second) of Torts §520, Comment f, at 37-38

          (1977).

The question whether an activity is abnormally dangerous or

ultrahazardous is one of law for the court. Restatement (Second) of

Torts §520, Comment l, at 42 (1977).

     Reviewing the six Restatement factors, the appellate court

agreed with the trial court that neither pile driving nor the

maintenance of the tunnel was an abnormally dangerous or

ultrahazardous activity. The appellate court concluded that class

plaintiffs' and Hartford's complaints lacked sufficient facts to

support the first three factors.

     We note class plaintiffs' and Hartford's argument that pile

driving is inherently or intrinsically dangerous. They reason that

since pile driving produces uncontrollable vibrations and

concussions similar to blasting, which courts generally consider to

be inherently or intrinsically dangerous, then pile driving should

likewise be subject to strict tort liability. See, e.g., Cincinnati

Terminal Warehouses, Inc. v. Contractor, Inc., 324 N.E.2d 581, 582

(Ohio App. 1975) (collecting cases). However, other courts have

rejected this analogy, reasoning:

          "In our opinion, the common factor, vibrations, is not

          sufficient to place the case under consideration in the

          same category as blasting cases. Machines, motors and

          instrumentalities which cause vibrations are in such

          common use in present-day activities and the probability

          of damage from their use is so variable that the mere

          fact that all of them cause vibrations is not a

          reasonable basis for common classification for liability.

          There are many cases involving damage by vibrations set

          in motion by instrumentalities other than explosives,

          e.g., pile drivers, drills, pavement breakers, etc. The

          overwhelming majority require allegation and proof of

          negligence. [Citations.]" Trull v. Carolina-Virginia Well

          Co., 264 N.C. 687, 691-92, 142 S.E.2d 622, 625 (1965).

     We agree with the appellate court that class plaintiffs' and

Hartford's complaints failed to sufficiently allege facts to meet

the first three factors of section 520. The complaints pled their

conclusion--pile driving is inherently or intrinsically dangerous--

without pleading sufficient facts showing why. Such a complaint

cannot withstand a motion to dismiss. See Knox, 88 Ill. 2d at 426-

28.

     Regarding the fourth factor of section 520, the appellate

court concluded that pile driving is common to construction

projects, and that underground tunnels and similar structures are

commonly maintained by public and private entities in commercial

and noncommercial settings. We disagree with this conclusion as it

relates to pile driving. It appears to stand for the general

proposition that a common industry practice cannot be considered to

be abnormally dangerous or ultrahazardous.

     The Restatement (Second) of Torts §520, Comment i, at 39

(1977), explains that "[a]n activity is a matter of common usage if

it is customarily carried on by the great mass of mankind or by

many people in the community." This comment gives the following

examples of activities that are not matters of common usage:

driving a tank; blasting; the manufacture, storage, transportation,

and use of high explosives; and drilling for oil. Restatement

(Second) of Torts §520, Comment i, at 40 (1977). The common and

deciding characteristic is that few persons engage in these

activities. In this case, tunnels under riverbeds are created,

maintained, and used by the great mass of humanity, or at least by

thousands of persons in Chicago every day. However, relatively few

persons engage in pile driving.

     Regarding the fifth factor, the appellate court noted that the

only way to replace the deteriorated pilings around the Kinzie

Street bridge was to drive more pilings into the river. Even if

pile driving were inherently or intrinsically dangerous (see

Fallon, 148 Ill. App. 3d at 935; Restatement (Second) of Torts

§§520(a), (c) (1977)), the Restatement comment to the fifth factor

explains that some such activities "can be carried on only in a

particular place. *** If these activities are of sufficient value

to the community (see Comment k), they may not be regarded as

abnormally dangerous when they are so located, since the only place

where the activity can be carried on must necessarily be regarded

as an appropriate one." Restatement (Second) of Torts §520, Comment

j, at 41-42 (1977).

     Regarding the sixth factor, the appellate court correctly

noted that the Loop is accessible only by many of the bridges that

link it with the rest of the city, and that the piling replacement

project was necessary to maintain the bridges as part of the public

transportation system. The appellate court also correctly noted

that "the management of underground tunnels [specifically, we note,

tunnels under riverbeds] to move freight, transport commuters,

house utility lines, and disperse waste is a necessary urban

activity."

     After considering the factors of section 520 of the

Restatement (Second) of Torts, we agree with the appellate court's

conclusion that the pile driving and the maintenance of the tunnel

were not abnormally dangerous or ultrahazardous activities.

Accordingly, we uphold the trial court's dismissal of class

plaintiffs' and Hartford's strict tort liability claims.

                                CONCLUSION

     For the foregoing reasons, the judgment of the appellate court

is affirmed in part and reversed in part, the judgment of the

circuit court is affirmed in part and reversed in part, and the

cause is remanded to the circuit court of Cook County.

Appellate court judgment affirmed in part

                                                    and reversed in part;

                                           circuit court affirmed in part

                                                    and reversed in part;

                                                          cause remanded.

                                                                         

     JUSTICE McMORROW, concurring in part and dissenting in part:

     I dissent from two of the holdings in the majority opinion.

For the reasons more fully stated in my dissenting opinion in

Barnett v. Zion Park District, 171 Ill. 2d 378, 399 (McMorrow, J.,

dissenting) and because I do not believe that the legislature

intended to immunize willful and wanton misconduct, I dissent from

the majority's holding that willful and wanton misconduct is

shielded by the immunity contained in section 2--201 of the Tort

Immunity Act. Additionally, I dissent from the majority's holding

that the discretionary immunity doctrine insulates the City, as a

matter of law, from liability for failing to repair the tunnel

damage upon notice of the breach and for failing to warn plaintiffs

of the risks of harm resulting from the breach. I briefly address

each point in turn.

     The majority's disposition of the willful and wanton counts in

the complaint is premised on the reasoning that tortious conduct of

a willful and wanton nature is immunized by a particular provision

of the Tort Immunity Act whenever such conduct is not expressly

excluded from the immunity provision in issue. As I noted in my

dissent in Barnett, the rationale underlying a grant of immunity

for simple negligence is different in kind from any justification

for immunizing tortious conduct that is intentionally harmful or

willful and wanton. This critical distinction has long been noted

in Illinois decisions. See, e.g., McCormick v. Burt, 95 Ill. 263,

266 (1880) (recognizing immunity for good-faith errors in public

official's discretionary judgment, where no allegations were made

that official acted "either wantonly or maliciously" (emphasis

added)); accord Barth v. Board of Education, 141 Ill. App. 3d 266,

273-74 (1986). Today, the majority expressly overrules Barth and

other cases which hold that section 2--201 of the Tort Immunity Act

does not immunize willful and wanton misconduct. I do not join in

this ruling.

     I further note that the decision upon which the majority

relies for much of its explanation of the discretionary immunity

doctrine, City of Chicago v. Seben, 165 Ill. 371 (1897), stated,

"Municipal corporations will not be held liable in damages for the

manner in which they exercise, in good faith, their discretionary

powers of a public, or legislative, or quasi judicial character."

(Emphasis added.) Seben, 165 Ill. at 377-78, quoted in slip op. at

10-11. As the Seben court implicitly recognized in the above

passage, good faith is a component of discretionary immunity. Good

faith is incompatible with willful and wanton misconduct.

     My second point of departure from the majority opinion

involves the application of discretionary immunity to those counts

of the complaint alleging that the City breached its duty to repair

the tunnel damage upon notice of the breach and to warn class

plaintiffs of the harm presented by the breach. The trial court

denied the City's motion to dismiss those counts of the complaint,

and the appellate court affirmed the denial of that motion to

dismiss. In reversing the appellate court on this issue, the

majority concludes that the City is entitled to what is, in effect,

unlimited immunity under the discretionary immunity doctrine. The

majority explains that plaintiffs are barred from proceeding on the

counts based on the City's failure to repair and failure to warn

because the plaintiffs "do not allege that there was any prescribed

method for how to repair the tunnel and how quickly, or how to warn

class plaintiffs of the tunnel breach. Thus, the City's actions

cannot be considered ministerial. See Seben, 165 Ill. at 378."

(Emphasis added.) Slip op. at 13.

     It would appear from the above holding that the majority bases

the City's discretionary immunity upon the failure of plaintiffs to

plead specified methods, rules, or policies governing repairs and

warnings. This suggests that such methods, rules, or policies

actually exist, or that the existence of preformulated "rules of

repair" or warning procedures is essential to stating a cause of

action for failure to repair and warn. No authority is cited for

this novel interpretation of the discretionary immunity doctrine,

except for Seben. However, Seben does not hold that a

municipality's inaction or failure to repair a known potentially

dangerous condition is immunized if there are no set policies or

rules in place for directing the specific repair. Indeed, it is

curious that the majority does not acknowledge that the Seben

court's analysis actually favors a finding that the acts or

omissions in the case at bar were ministerial rather than

discretionary. The Seben court affirmed a verdict in favor of an

injured plaintiff despite the City's attempt to characterize its

acts or omissions in connection with an open and uncovered catch

basin as discretionary and therefore immune. The court noted, "A

municipal corporation acting in good faith is not liable for any

error of judgment in constructing a system of drainage. *** The

adoption of a general plan of sewerage involves the performance of

a duty of a quasi judicial character, but the construction and

regulation of sewers and the keeping of them in repair, *** are

ministerial duties, and the municipality, which constructs and owns

such sewers, is liable for the negligent performance of such

duties." (Emphasis added.) Seben, 165 Ill. at 378-79. It would

appear, therefore, that the reasoning and result in Seben require

the opposite holding from the one reached by the majority on the

issue of failure to repair.

     In justifying the City's failure to warn as a discretionary

decision cloaked with immunity, the majority states that the City

"had to decide whether warning the public would cause panic and, if

so, whether that warning was justified." Slip op. at 13. I cannot

join in this reasoning insofar as it implies that the legal

standard for deciding whether failure to warn of a known danger is

immunized as a matter of law is whether such a warning might cause

panic.

     I note also that the burden of establishing entitlement to

immunity, as an affirmative defense, is on the City. The Tort

Immunity Act contains no express immunity for failing to repair a

known hazardous condition on City property or for failing to warn

affected individuals of the risks of harm. As the majority

acknowledges in its opinion, private entities and public entities

are equally liable in tort, except as the legislature expressly

provides through the passage of express immunity statutes. Because

I am not persuaded that the discretionary immunity doctrine

insulates the City from liability for failure to repair the tunnel

and warn potential victims that they lay in harm's way, I do not

join the majority's decision to grant the City immunity as a matter

of law on this issue.

     For the reasons stated, I dissent in part from the opinion of

the majority.