Docket No. 103289.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

---

THE ILLINOIS DEPARTMENT OF HEALTHCARE AND FAMILY SERVICES, Appellant, v. EVERETT WARNER, Appellee.

*Opinion filed January 25, 2008.*

JUSTICE FREEMAN delivered the judgment of the court, with opinion.

Chief Justice Thomas and Justices Garman and Burke concurred in the judgment and opinion.

Justice Kilbride dissented, with opinion, joined by Justices Fitzgerald and Karmeier.

## OPINION

In February 1996 the Illinois Department of Public Aid, now known as the Illinois Department of Healthcare and Family Services (the Department), filed a petition in the circuit court of Adams County to establish Everett Warner (respondent) as the father of C.S. and B.S. Respondent entered into an agreed judgment of parentage, and the court ordered him to pay child support. In October 2002, in a separate proceeding, respondent's parental rights were terminated. More than two years later–in March 2005–respondent petitioned the circuit court to vacate the child support order. Relying on section 17

of the Adoption Act (750 ILCS 50/17 (West 2004)), respondent argued that the termination of his parental rights had also ended his parental responsibilities, including the obligation to pay child support. The circuit court denied the petition, and respondent appealed. The appellate court reversed. 366 Ill. App. 3d 1178. For the reasons set forth below, we reverse the judgment of the appellate court.

BACKGROUND

Debbie Stover is the mother of C.S., born December 12, 1993, and B.S., born August 18, 1995. In February 1996, the Department petitioned the circuit court, on Stover's behalf, to establish respondent as the father of the two children, and to order him to pay child support. On March 28, 1996, the court entered a judgment of parentage, pursuant to the parties' stipulation, finding that respondent was the father of C.S. and B.S. The court ordered respondent to pay child support in the amount of $46.13 per week. In September 1999 the Department petitioned the court for a modification of the child support order. The petition, which alleged that the mother had custody of the children, claimed that there had been a "significant change in circumstances" since the initial child support order was entered. According to the Department, there was a need for health insurance or some other means of providing for the children's health care. The Department asked that respondent be ordered to carry dependent health insurance and to pay any uninsured health-care costs. On October 7, 1999, the court increased respondent's support obligation to $120 every two weeks. However, the court denied the Department's health insurance request "due to [the] prohibitive cost to obtain such insurance for the dependents." The court added: "Respondent agrees to [the] increase in the support obligation."

On October 24, 2002, in a separate proceeding in juvenile court, respondent's and Stover's parental rights were terminated. The record in the case at bar contains no copies of the termination orders.

On February 2, 2005, respondent filed a *pro se* motion to end his child support obligation. In support of this motion, respondent noted that both his and Stover's parental rights had been terminated. At the hearing that followed, the Department informed the court that respondent's support payments were being used by the state to help

pay for the children's foster care. The Department indicated it would oppose any motion to end respondent's support obligation. According to the Department, a parent's obligation to support a child does not end with the termination of parental rights. That obligation would cease, the Department asserted, only if the child were adopted. The circuit court continued respondent's motion in order to allow him time to consult with an attorney.

Respondent retained an attorney, and filed a petition to vacate the child support order. The petition was based on section 17 of the Adoption Act, which provides that, after either a termination of parental rights or a judgment of adoption, the natural parents of a child sought to be adopted shall be relieved of all parental responsibility for the child. 750 ILCS 50/17 (West 2004).

On March 31, 2005, at a hearing on the petition, respondent and the Department stipulated, in relevant part, that (1) respondent had continued to pay child support of $120 every two weeks even after his parental rights were terminated, (2) the children had been in the custody and guardianship of the Illinois Department of Children and Family Services (DCFS) since before the date of termination, and (3) the state had received respondent's child support payments since the date of termination. The circuit court took judicial notice of the juvenile court orders in cases 00–JA–41 and 00–JA–42 terminating respondent's and Stover's parental rights, as well as the most recent order in those cases showing that the goal for the children remained adoption.

During the March 31 hearing, respondent argued that, under section 17 of the Adoption Act, he was relieved of all parental responsibility, including any obligation to pay child support. In response, the Department argued that, under *In re M.M.*, 156 Ill. 2d 53 (1993), the termination of parental rights does not effect a complete severance between a child and its natural parents. The parent still has a residual, common law duty to support the child, and this residual duty stands as an exception to section 17 of the Adoption Act. According to the Department, respondent in the case at bar retained a residual obligation to pay child support, even though his parental rights had been terminated.

On May 6, 2005, the circuit court entered an order denying respondent's petition to vacate the child support order. The court stated:

> "Pursuant to the clear language of *In re M.M.*, 156 Ill. 2d 53, 619 N.E.2d 702, 708 (1993), termination of the respondent's parental rights did not extinguish his obligation to support his children, notwithstanding the language of 750 ILCS 50/17, which was in effect at the time of the holding in *In re M.M.*"

Respondent appealed, and the appellate court reversed. 366 Ill. App. 3d 1178. The appellate court held that, under section 17 of the Adoption Act, a termination of parental rights ends all parental responsibility, including the obligation to pay child support. In reaching this decision, the court rejected the Department's arguments that (1) section 17 did not apply to the case at bar because neither C.S. nor B.S. was in the process of being adopted, and, alternatively (2) even if section 17 did apply, the termination of parental rights did not eliminate a natural parent's common law, residual duty to support a child. With regard to the first argument, the appellate court acknowledged that section 17, by its terms, applies to " 'the natural parents of a child sought to be adopted.' " 366 Ill. App. 3d at 1180, quoting 750 ILCS 50/17 (West 2004). The court also noted the Department's assertion that there was no evidence before the trial court suggesting that anyone was seeking to adopt C.S. or B.S. Nevertheless, the appellate court concluded: "a fair reading of the statute includes situations where a child is available for adoption, whether or not someone is actively seeking to adopt that child, and where a child has been adopted." 366 Ill. App. 3d at 1180. The appellate court noted that respondent's parental rights had been terminated and that the goal for C.S. and B.S. was adoption. According to the appellate court, C.S. and B.S. therefore were available for adoption, and section 17 applied.

Turning to the Department's alternative argument regarding the residual duty of support, the court pointed to *M.M.*, upon which the circuit court relied in concluding that respondent's obligation to support his children survived the termination of his parental rights. The appellate court asserted that *M.M.*'s mentioning of the residual duty of support was part of a general discussion dealing with historical

context. According to the appellate court, *M.M.* "did not attempt to address the current viability of any residual duty of support." 366 Ill. App. 3d at 1182. The appellate court added that *M.M.* made no specific mention of section 17 of the Adoption Act.

We allowed the Department's petition for leave to appeal. 210 Ill. 2d R. 315. We also allowed the Cook County public guardian to file an *amicus curiae* brief in support of the Department. 210 Ill. 2d R. 345.

### ANALYSIS

Before this court, the Department advances the same two arguments it raised below. First, the Department contends that section 17 is inapplicable to the case at bar because neither C.S. nor B.S. is "a child sought to be adopted" (750 ILCS 50/17 (West 2004)). Alternatively, the Department argues that even if section 17 does apply, it does not eliminate a natural parent's common law, residual duty of support, which survives a termination of parental rights.

To address the Department's first argument, we are required to construe section 17 of the Adoption Act. Our review is therefore *de novo*. *In re Detention of Lieberman*, 201 Ill. 2d 300, 307 (2002). The primary objective in interpreting a statute is to give effect to the intent of the legislature. *Harshman v. DePhillips*, 218 Ill. 2d 482, 493 (2006); *Lieberman*, 201 Ill. 2d at 307. The most reliable indicator of the legislature's intent is the language of the statute, which is given its plain, ordinary and popularly understood meaning. *Lieberman*, 201 Ill. 2d at 308. "We read the statute as a whole, considering all relevant parts." *Harshman*, 218 Ill. 2d at 493.

Section 17 provides:

> "After either the entry of an order terminating parental rights or the entry of a judgment of adoption, the natural parents of a child *sought to be adopted* shall be relieved of all parental responsibility for such child and shall be deprived of all legal rights as respects the child, and the child shall be free from all obligations of maintenance and obedience as respects such natural parents." (Emphasis added.) 750 ILCS 50/17 (West 2004).

According to its plain language, section 17 applies to the natural parents of a child "sought to be adopted." The term "seek" is defined as "to make an attempt: TRY." Webster's Third New International Dictionary 2055 (2002). Under this definition, a child "sought to be adopted" is one whom someone is attempting or trying to adopt.

Section 17 does not identify who may seek to adopt a child. This section could reasonably, although erroneously, be construed in isolation to mean that merely by making a child available for adoption the state "seeks" to have the child adopted. This is not the case. Section 2 of the Adoption Act provides that only individuals who meet certain requirements may institute an adoption proceeding. 750 ILCS 50/2 (West 2004). When section 17 is read in conjunction with section 2, it is clear that the state cannot seek the adoption of a child.

In the case at bar, there is no indication in the record that C.S. and B.S.–who are 13 and 12 years old, respectively–are now, or ever were, in the process of being adopted.[1] Accordingly, under the plain meaning of the relevant statutory terms, neither of them is "a child sought to be adopted" (750 ILCS 50/17 (West 2004)).

Notwithstanding the foregoing, respondent argues that section 17 should not be interpreted as applying only where the child is "sought to be adopted." According to respondent, construing the statute in this manner would lead to an absurd result: "the statute would not apply to a child who is adopted and therefore no longer sought to be adopted." Respondent appears to argue that, because of this absurd result, the "sought to be adopted" language should not apply after the entry of a judgment of adoption. According to respondent, this language also should not apply after the termination of parental rights. Respondent's argument, in essence, is that in construing section 17, we should ignore the "sought to be adopted" language.

Section 17 deals with the effect on parental rights and responsibilities of two distinct judicial actions: an order terminating parental rights and a judgment of adoption. In the latter of these two–the entry of a judgment of adoption–the result is that the child is adopted. In such situations, where section 17 applies "after the entry

---

[1] In his brief to this court, respondent does not argue that C.S. and B.S. were sought to be adopted.

of a judgment of adoption" and the child is adopted, it would be illogical to limit the statute's application to instances where the child is "sought to be adopted." By definition, a child who is adopted cannot simultaneously be "sought to be adopted." The two terms cancel each other out. However, the same cannot be said of an order terminating parental rights, which does not necessarily result in the adoption of the child. Where the child is not adopted, there is no contradiction in terms–as there is in the judgment-of-adoption situation–that would prevent the application of the "sought to be adopted" language. Moreover, where the child is not adopted, there is a sound policy reason for limiting the termination of parental responsibilities to situations where the child is "sought to be adopted." Section 17 contemplates that, once a prospective adoptive parent steps forward, the transition to an adoptive parent's taking financial responsibility for the child can begin to take place. However, where no prospective adoptive parent has come forward, the termination of the natural parent's support obligation would leave the child with only the state to look to for sustenance. By limiting the application of section 17 to situations where the child is "sought to be adopted," the General Assembly clearly intended to avoid such a result.

We conclude that, after the entry of an order terminating parental rights, where the child is not adopted, section 17 applies, as its plain language indicates, only where the child is "sought to be adopted." Conversely, after the entry of a judgment of adoption, where the child is adopted, the "sought to be adopted" language cannot logically apply. In so holding, we adhere to the principle that a statute must be given a sensible construction, " 'even though such construction qualifies the universality of its language.' " *Adams v. Northern Illinois Gas Co.*, 211 Ill. 2d 32, 64 (2004), quoting *In re Illinois Bell Switching Station Litigation*, 161 Ill. 2d 233, 246 (1994). We emphasize the limited scope of our interpretation. We are qualifying the reach of the "sought to be adopted" language, not eliminating it from the statute altogether. To hold that this language is of no effect, as respondent urges, would render the language superfluous or meaningless. Such a construction is to be avoided, if possible. *People ex rel. Ryan v. Agpro, Inc.*, 214 Ill. 2d 222, 227 (2005).

While respondent in the case at bar argues that the phrase "sought to be adopted" in section 17 should simply be ignored, the appellate

court below followed a different path to reach essentially the same conclusion. According to the appellate court, "a fair reading of [section 17] includes situations where a child is *available for adoption*, whether or not someone is actively seeking to adopt that child." (Emphasis added.) 366 Ill. App. 3d at 1180. In the appellate court's view, C.S. and B.S. were available for adoption, and section 17 therefore applied, regardless of whether C.S. and B.S. were sought to be adopted. We find this analysis unpersuasive.

We initially note that the phrase "available for adoption" does not appear in section 17. Rather, the appellate court, without any citation to authority, construed the phrase "sought to be adopted" to include children "available for adoption." The appellate court's analysis ignores the fact that the phrase "available for adoption" has a precise meaning in the Adoption Act. See 750 ILCS 50/1(F) (West 2004) (defining a person "available for adoption"). Had the General Assembly intended to include children "available for adoption" within the ambit of section 17, it could have specifically done so. It did not. We cannot depart from the plain language of a statute by reading into it exceptions, limitations, or conditions not expressed by the legislature. *In re Michelle J.*, 209 Ill. 2d 428, 437 (2004).

Finally, we note respondent's reference, in his appellee brief, to section 2–29(2) of the Juvenile Court Act of 1987 (705 ILCS 405/2–29(2) (West 2004)). This provision was not raised by respondent in either the circuit court or the appellate court as the basis for his claim that the child support order should be vacated. Respondent has therefore forfeited any argument based on section 2–29(2). See *Vine Street Clinic v. HealthLink, Inc.*, 222 Ill. 2d 276, 301 (2006). In addition, before this court, respondent provides no argument with regard to section 2–29(2), nor does he explain how this provision relates to his claim. His reference to section 2–29(2) in his brief consists solely of the quotation of the statute. Without more, we are unable to review any contentions that might have been made with regard to this issue. 210 Ill. 2d R. 341(h)(7). We faced a similar situation in *Zaabel v. Konetski*, 209 Ill. 2d 127 (2004), where the petitioner raised a point in his reply brief but offered no argument. In a unanimous opinion authored by Justice Garman, we held that the point therefore was waived. We noted that a forfeited issue may sometimes be addressed in the interest of justice, but stated: "[I]n this

case the interest of justice does not require that we search for arguments that [the petitioner] himself has made no attempt whatsoever to provide." *Zaabel*, 209 Ill. 2d at 137.

Moreover, as previously noted, the record in this case contains no copies of the juvenile court orders terminating respondent's and Stover's parental rights. It was the responsibility of respondent, as the appellant below, to present a sufficiently complete record to support a claim of error. *Webster v. Hartman*, 195 Ill. 2d 426, 432 (2001). The absence of the orders makes it difficult for us to discuss with any certainty the impact, if any, that section 2–29(2) has on this case. Under section 2–29(2), the termination of parental responsibility occurs in the context of the naming of a guardian. Section 2–29(2) provides that, in terminating parental rights, the juvenile court *may* authorize the guardian of the person of the minor to consent to adoption. An order so empowering the guardian to consent to adoption relieves the parents of all parental responsibility. 705 ILCS 405/2–29(2) (West 2004). In the case at bar, because the orders terminating parental rights are not in the record, we do not know if the juvenile court authorized the guardian to consent to adoption and thereby, under section 2–29(2), relieved the parents of all parental responsibility. Under these circumstances, we cannot determine if section 2–29(2) is relevant to the instant case. Thus, given respondent's failure to properly raise the applicability of section 2–29(2) below, his failure to properly brief the statute before this court, and his failure to provide a sufficient record, we decline to engage in discussion which, of necessity, would be mere speculation.[2]

We express no opinion as to whether section 2–29(2) could be considered in a case where the record contained support for the claim.

---

[2]For example, such discussion would require us to speculate as to the nature of the arguments regarding section 2–29(2) that respondent could have made, but did not. We would, in effect, be acting as an advocate. A reviewing court should not assume such a role. See *People v. Jung*, 192 Ill. 2d 1, 22 (2000) (Harrison, C.J., dissenting); *Vernon Hills III Ltd. Partnership v. St. Paul Fire & Marine Insurance Co.*, 287 Ill. App. 3d 303, 311 (1997).

We leave for another day the resolution of that question, when we are confronted with an appropriate case.

Notwithstanding the foregoing, the dissent argues that section 2–29(2) should have been included in our analysis, regardless of any forfeiture of the issue or deficiency in the record. According to the dissent, this provision of the Juvenile Court Act "is clearly relevant to construction of section 17 of the Adoption Act." Slip op. at 15 (Kilbride, J., dissenting, joined by Fitzgerald and Karmeier, JJ.). We agree that the interpretation of section 17–specifically, the "sought to be adopted" language–is at the heart of this appeal. However, we find unpersuasive the dissent's argument that section 2–29(2) is essential to our analysis.

Under section 2–29(2), as noted, the juvenile court, upon the satisfaction of certain conditions, "may terminate parental rights and empower the guardian of the person of the minor, in the order appointing him or her as such guardian, *** to consent to the adoption." 705 ILCS 405/2–29(2) (West 2004). Section 2–29(2) provides further that "[a]n order so empowering the guardian to consent to adoption deprives the parents of the minor of all legal rights as respects the minor and relieves them of all parental responsibility for him or her ***." 705 ILCS 405/2–29(2) (West 2004). In section 2–29(2), it is the order authorizing the guardian to consent to adoption that triggers the termination of parental responsibility. This contrasts with section 17 of the Adoption Act, which provides that, after the entry of an order terminating parental rights, "the natural parents of a child *sought to be adopted* shall be relieved of all parental responsibility for such child." (Emphasis added.) 750 ILCS 50/17 (West 2004). Here, the question of the termination of parental responsibility turns on whether the child is "sought to be adopted."

In the case at bar, even if we were to consider section 2–29(2), as the dissent urges, the statute would provide no help in construing section 17. Section 2–29(2) simply has nothing to say about the interpretation of the term "sought to be adopted" in section 17.[3] For

___

[3]Indeed, the term "sought to be adopted" does not appear in section 2–29(2).

this reason, we reject the dissent's contention that section 2–29(2) should have been included in our analysis.

In sum, neither C.S. nor B.S. is "a child sought to be adopted" under section 17 of the Adoption Act. Contrary to the conclusion of the appellate court below, section 17 does not apply to the situation in the case at bar.

Because of our decision with regard to this issue, we need not address the Department's alternative argument that a natural parent's common law, residual duty of support survives the termination of his parental rights. We recognize the importance of this residual-duty issue. In addition, we acknowledge that there is disagreement within our appellate court on this question. Compare *Bodine v. Bodine*, 127 Ill. App. 3d 492, 496 (1984) ("an adoption will not relinquish a natural parent's obligation to support the child if the adoptive parent is unable to do so"), with 366 Ill. App. 3d at 1182 (a termination of parental rights ends all parental responsibility, including the obligation to pay child support). Nevertheless, as we have already held, section 17 of the Adoption Act does not apply to C.S. and B.S. This decision disposes of the appeal in the case at bar.

The dissent takes a different view, arguing that section 17 applies in this case and that, under section 17, respondent's parental responsibilities ended with the termination of his parental rights. In support, the dissent points to *In re Adoption of Syck*, 138 Ill. 2d 255 (1990), and *In re C.B.*, 221 Ill. App. 3d 686 (1991). According to the dissent, these cases articulate a "bright-line rule" that the termination of parental rights "forever sever[s] all relations between parent and child." Slip op. at 18 (Kilbride, J., dissenting, joined by Fitzgerald and Karmeier, JJ.). The dissent notes that *Syck* and *C.B.* were cited by respondent. Slip op. at 18 (Kilbride, J., dissenting, joined by Fitzgerald and Karmeier, JJ.).

There are three reasons why our analysis does not include *Syck* and *C.B.*, which appear to support respondent's claim that, under section 17, the termination of his parental rights ended his parental responsibilities as well. First, regardless of whether *Syck* and *C.B.* support respondent's position with regard to section 17, they are irrelevant to our opinion, which holds that section 17 does not apply. A second, related reason for not incorporating these cases in our analysis is that, in his brief to this court, respondent cited *Syck* and *C.B.* solely in opposition to the Department's alternative, "residual

duty of support" argument, a claim which we expressly do not reach. Under the Department's argument, a natural parent has a residual, common law duty of support which survives a termination of parental rights, and this residual obligation stands as an exception to section 17. See *In re M.M.*, 156 Ill. 2d 53, 62 (1993) (observing that, "[w]ith the exception of the biological parents' residual duty to support their children [citation] *** adoption constitutes a complete and permanent severance of all legal and natural rights between such parents and children"). *Syck* and *C.B.* appear to contradict this residual-duty contention. However, it is irrelevant whether *Syck* and *C.B.* support or contradict this claim. As previously indicated, because of our holding that section 17 does not apply to this case, it is unnecessary to address the Department's alternative argument regarding a residual-duty *exception* to section 17.

A third reason why *Syck* and *C.B.* are not incorporated in our analysis is that, while each of these opinions quotes section 17, neither deals with the central issue in the case at bar: whether, under section 17, a termination of parental rights ends all parental responsibilities, including the duty to pay child support. In addition, neither *Syck* nor *C.B.* expressly analyzes the "sought to be adopted" language in section 17.

For these reasons, *Syck* and *C.B.* are not helpful in resolving the question of whether section 17 applies to this case.

### CONCLUSION

For the reasons stated, we reverse the judgment of the appellate court, which reversed the judgment of the circuit court, and affirm the judgment of the circuit court.

*Appellate court judgment reversed;*
*circuit court judgment affirmed.*

JUSTICE KILBRIDE, dissenting:

I respectfully dissent for two reasons. First, the majority's narrow interpretation of section 17's "sought to be adopted" language, as meaning exclusively the filing of a petition for adoption, creates untenable inconsistencies between section 17 of the Adoption Act (750 ILCS 50/17 (West 2004)), and section 2–29(2) of the Juvenile

Court Act (705 ILCS 405/2–29(2) (West 2004)), addressing parental obligations after the termination of parental rights. See *In re M.M.*, 156 Ill. 2d 53, 61 (1993) ("we consider the Juvenile Court Act in concert with the Adoption Act"). Second, the majority's holding is also inconsistent with prior judicial holdings on the effect of the termination of parental rights. The majority avoids these issues by inappropriately finding that Warner procedurally forfeited the argument. A proper analysis of section 17 requires the construction of "sought to be adopted" to include DCFS's efforts to place C.S. and B.S. with an adoptive family. Under a proper construction of the statute, Warner's duty of support to C.S. and B.S. ended with the order terminating his parental rights and DCFS setting a goal of an adoptive placement for the children. Therefore, I disagree with the majority's analysis and result.

To begin, section 2.1 of the Adoption Act specifically mandates: "This Act shall be construed in concert with the Juvenile Court Act of 1987." 750 ILCS 50/2.1 (West 2006). The majority's construction of section 17 of the Adoption Act conflicts with section 2–29(2) of the Juvenile Court Act. The majority acknowledges that we are required to " 'read the statute as a whole, considering all relevant parts.' " Slip op. at 5, quoting *Harshman v. DePhillips*, 218 Ill. 2d 482, 493 (2006). Nevertheless, the majority ignores that section 2.1 mandates that the Adoption Act be construed in concert with the Juvenile Court Act and, instead, declines to address this argument because it contends that Warner forfeited our review by raising pertinent sections of the Juvenile Court Act for the first time on appeal here, by not expounding on its significance to the present case, and by failing to include any termination orders in the record demonstrating that his parental rights were terminated pursuant to section 2–29(2). Slip op. at 8.

The majority bypasses section 2–29(2) because the juvenile orders are not in the record. The record in this case indicates that the parties stipulated to the termination proceedings and orders. Those proceedings and the most recent review order were presented to the court as evidence, and the court took judicial notice of the termination proceedings.

Supreme Court Rule 321 (155 Ill. 2d R. 321) provides that "[t]he record on appeal shall consist of *** the entire original common law

record \*\*\*. The common law record includes every document filed and judgment and order entered in the cause and any documentary exhibits offered and filed by any party." Thus, under Rule 321, the juvenile proceedings offered in evidence should be part of the common law record in this case. It may have been a clerical error in omitting these orders from the record on appeal. Even though the record does not contain a copy of the orders terminating Warner's parental rights, this court is required to take judicial notice of the juvenile proceedings.

In *People v. Davis*, 65 Ill. 2d 157, 161 (1976), this court noted:

"In McCormick on Evidence, section 330, at 766 (2d ed. 1972), it is said to be 'settled, of course, that the courts, trial and appellate, take notice of their own respective records in the present litigation, both as to matters occurring in the immediate trial, and in previous trials or hearings. The principle seemingly is equally applicable to matters of record in the proceedings in other cases in the same court, and some decisions have recognized this, but many courts still adhere to the needless requirement of formal proof, rather than informal presentation, of recorded proceedings in other suits in the same court.' \*\*\* Taking judicial notice of matters of record in other cases in the same court is simply an application of the increasingly recognized principle that matters susceptible of judicial notice include facts 'capable of immediate and accurate demonstration by resort to easily accessible sources of indisputable accuracy.' " (Emphasis omitted.) *Davis*, 65 Ill. 2d at 161, quoting E. Cleary, McCormick on Evidence §3301, at 763 (2d ed. 1972).

Here, the circuit court properly took judicial notice of the proceedings in the juvenile cases, and this court must also take judicial notice of those proceedings. Section 8–1002 of the Code of Civil Procedure provides, in relevant part:

"In case of the review by the Supreme Court of a judgment or order of the appellate court, the Supreme Court shall take judicial notice of all matters of which the circuit court was required to take judicial notice \*\*\*." 735 ILCS 5/8–1002 (West 2004).

Under section 8–1002, therefore, this court is required to take judicial notice of the termination proceedings and orders judicially noticed by the circuit court. It is improper for the majority to avoid the issue by finding that respondent has forfeited the issue.

On the issue of statutory construction, "[o]ur primary objective in construing a statute is to ascertain and give effect to the intention of the legislature." *Barragan v. Casco Design Corp.*, 216 Ill. 2d 435, 441 (2005). We must, therefore, consider all authorities that weigh upon the legislature's intended meaning of section 17, regardless of whether they were specifically cited by the parties. Indeed, it would be improper to construe a statute in a manner that the legislature did not intend based merely on a party's shortcomings in argument. This court has never confined itself to the research and argument of the parties, or even of the courts below, in affirming a correct result in the appellate court. See, *e.g.*, *People v. P.H.*, 145 Ill. 2d 209, 220 (1991) ("The reasons assigned by the [court below] for its judgment are immaterial if the decision is correct. *** An appellee may raise any argument or basis supported by the record to show the correctness of the judgment, even though he had not previously advanced such an argument"). Most importantly, the legislature calls on us to interpret the Adoption Act and Juvenile Court Act harmoniously. Accordingly, section 2–29(2) of the Juvenile Court Act should be considered because it is clearly relevant to construction of section 17 of the Adoption Act.

Section 2–29(2) of the Juvenile Court Act states:

"If a petition or motion alleges and the court finds that it is in the best interest of the minor that parental rights be terminated and the petition or motion requests that a guardian of the person be appointed and authorized to consent to the adoption of the minor, the court, with the consent of the parents, if living, or after finding, based upon clear and convincing evidence, that a parent is an unfit person as defined in Section 1 of the Adoption Act, may terminate parental rights and empower the guardian of the person of the minor, in the order appointing him or her as such guardian, to appear in court where any proceedings for the adoption of the minor *may at any time be pending* and to consent to the adoption. Such consent is sufficient to authorize the court in the

-15-

adoption proceedings to enter a proper order or judgment of adoption without further notice to, or consent by, the parents of the minor. An order so empowering the guardian to consent to adoption deprives the parents of the minor of all legal rights as respects the minor and relieves them of all parental responsibility for him or her, and frees the minor from all obligations of maintenance and obedience to his or her natural parents." (Emphasis added.) 705 ILCS 405/2–29(2) (West 2004).

Section 2–29(2) specifically provides that an appointed guardian empowered to consent to adoption may give consent when an adoption "may at any time be pending." The section's employment of "may" and "any time" indicates the termination of parental rights accompanied by an order appointing a guardian with power to consent to adoption strips the natural parent of all rights and relieves him or her of all responsibilities toward the child even though *no* adoption action may be pending *at that time*.

The majority's interpretation of section 17 of the Adoption Act creates disharmony between that section and section 2–29(2) of the Juvenile Court Act. Both statutes address the rights and responsibilities of natural parents upon termination of parental rights. Both statutes also address a context where adoption is encouraged, either through a judicial order appointing a guardian with power to consent to an adoption at some time, or through DCFS's promotion of an adoptive placement. Yet, under the majority's construction of section 17, the statutes resolve natural parents' subsequent responsibilities differently. Under the Adoption Act, the natural parent's duty of support continues unless, fortuitously, a third party seeks an adoption. Under the Juvenile Court Act, however, the natural parent's duty of support ends irrespective of whether any party actually seeks an adoption.

To allow this disparity invites absurdity into the overall statutory scheme surrounding the termination of parental rights. I can conceive of no reason why the legislature would treat similarly situated natural parents differently under the Adoption Act and the Juvenile Court Act. See *Progressive Universal Insurance Co. of Illinois v. Liberty Mutual Fire Insurance Co.*, 215 Ill. 2d 121, 134 (2005) ("we must presume that when the legislature enacted a law, it did not intend to

produce absurd, inconvenient or unjust results"). Moreover, allowing an inconsistency between the statutes violates standard principles of statutory construction requiring us to harmonize the effect of different statutes addressing the same subject matter. See *People v. McCarty*, 223 Ill. 2d 109, 133 (2006) ("Under the doctrine of *in pari materia,* two statutes dealing with the same subject will be considered with reference to one another to give them harmonious effect"). Embracing a construction of section 17 of the Adoption Act that allows this disparity violates the legislature's *specific instruction to the courts* to harmonize the Adoption Act with the Juvenile Court Act. See 750 ILCS 50/2.1 (West 2004) ("This Act shall be construed in concert with the Juvenile Court Act of 1987"); see also *In re M.M.*, 156 Ill. 2d at 61 ("we consider the Juvenile Court Act in concert with the Adoption Act").

To create harmony, both statutes must operate to relieve natural parents of their ongoing responsibilities when their parental rights have been terminated and when DCFS or the circuit court takes some action to promote the child's adoption. This goal is achieved by construing "sought to be adopted" to include DCFS's seeking an adoptive placement for C.S. and B.S. In fact, the majority concedes that this construction is reasonable. Slip op. at 6; see also *Barragan*, 216 Ill. 2d at 441-42 ("Where two statutes are allegedly in conflict, a court has a duty to interpret the statutes in a manner that avoids an inconsistency and gives effect to both statutes, where such an interpretation is reasonably possible").

The reasonableness of this interpretation is demonstrated by the legislature's repeated instructions to DCFS to facilitate adoptive placements, and DCFS's extensive efforts to adhere to the legislature's commands. See 20 ILCS 505/5(r) (West 2006) ("The Department [DCFS] shall promulgate regulations encouraging all adoption agencies to voluntarily forward to the Department or its agent names and addresses of all persons who have applied for and have been approved for adoption of a hard-to-place or handicapped child and the names of such children who have not been placed for adoption. [A list of such persons] shall be made available, without charge, to every adoption agency in the State to assist the agencies in placing such children for adoption"); 20 ILCS 505/7.1 (West 2006) ("There is created the One Church One Child Advisory Board to

advise the Department [DCFS] in the placement of children by encouraging black churches to help find permanent homes for black children waiting to be adopted"); http://www.state.il.us/dcfs/adoption/index.shtml (last visited December 12, 2007) ("The Department helps thousands of adoptable children to find a new home each year. *** DCFS provides and funds a variety of financial and non-financial benefits after adoption or guardianship, including subsidies for families who adopt waiting children or become guardians of children in DCFS care"). These legislative commands and executive undertakings by DCFS contradict the majority's assertion that "it is clear that the state cannot seek the adoption of a child." Slip op. at 6. Contrary to the majority's conclusion, section 2 of the Adoption Act, requiring certain qualifications of individuals seeking to adopt, in no way undermines the fact that the state may seek to facilitate a child's adoption. See 750 ILCS 50/2 (West 2004).

Additionally, the majority's holding is also inconsistent with prior judicial holdings on the effect of the termination of parental rights. Construing "sought to be adopted" to include DCFS's efforts at facilitating adoption, and relieving a natural parent of the duty to support, is consistent with our prior holding interpreting the termination of parental rights as a bright-line event forever severing all relations between parent and child. This court has stated: "Termination of parental rights destroys the parent-child relationship. *The effect of a termination of parental rights is made grimly clear by section 17 of the Adoption Act.*" (Emphasis added.) *In re Adoption of Syck*, 138 Ill. 2d 255, 274-75 (1990). Likewise, in *In re C.B.*, 221 Ill. App. 3d 686 (1991), the appellate court observed: "When viewed from the perspective of the child, the parent whose parental rights have been terminated no longer exists. To be blunt, the situation is as if the parent had died." *C.B.*, 221 Ill. App. 3d at 688. Warner, in fact, presented these persuasive authorities to us, yet the majority refuses to acknowledge that these cases support respondent's claim that termination of his parental rights ended his parental responsibilities.

The majority's interpretation of section 17, blurs the previous bright-line rule and creates potential practical difficulties. For example, if the filing of an adoption petition triggers the effect of section 17, what is the status of a natural parent's obligations when a petitioner

voluntarily withdraws the petition, or is found unqualified to adopt under section 2?

The majority's interpretation of section 17 of the Adoption Act also requires us to overlook whether a residual common law duty of support remains even in the wake of the termination of parental rights. See *In re M.M.*, 156 Ill. 2d at 62 ("With the exception of the biological parents' residual duty to support their children *** adoption constitutes a complete and permanent severance of all legal and natural rights between such parents and children"). The parties presented this issue, but the majority sidesteps it by its construction of section 17 of the Adoption Act. Slip op. at 9.

I believe that we must determine this issue to avoid confusion, and we must hold that the common law residual duty to support is abrogated when section 17 applies. In reviewing the residual duty, *M.M.* and its predecessors all relied on *Dwyer v. Dwyer*, 366 Ill. 630 (1937). The applicable section of the Adoption Act at the time of *Dwyer*, unlike section 17 of the current version of the Adoption Act, never addressed the *duties* of natural parents to their children; rather, it only removed the natural parents' *rights* respecting the children and relieved the child of any duties to the natural parents. Compare 750 ILCS 50/17 (West 2004) ("After either the entry of an order terminating parental rights or the entry of a judgment of adoption, the natural parents of a child sought to be adopted shall be relieved of all parental responsibility for such child and shall be deprived of all legal rights as respects the child, and the child shall be free from all obligations of maintenance and obedience as respects such natural parents") with Ill. Rev. Stat. 1935, ch. 4, par. 8 ("The natural parents of a child so adopted shall be deprived, by the decree, of all legal rights, as respects the child, and the child shall be freed from all obligations of maintenance and obedience as respects such parents"). Given this change in the statutory language, the legislature intended natural parents' common law residual obligation of support to end with the termination of parental rights under section 17.

To conclude, I cannot concur with an interpretation of section 17 creating conflict with another statute on the same subject, when a reasonable construction exists that will both harmonize the overall statutory scheme addressing the termination of parental rights and adoptions, and acknowledge DCFS's adoptive placement efforts.

Today's opinion is also inconsistent with prior judicial holdings on the effect of the termination of parental rights. Therefore, I respectfully dissent.

JUSTICES FITZGERALD and KARMEIER join in this dissent.